UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___10/31/17___

------------------------------------------------------------ X
UNITED STATES OF AMERICA,                    :
                                             :           16-CR-374 (VEC)
        -against-                            :
                                             :           OPINION AND ORDER
JASON MARLEY, ORLANDO HARLEY, and            :
NYKOLI WILLIAMS                              :
                                             :
                            Defendants.      :
------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

Defendant Jason Marley has been charged with conspiracy to distribute controlled substances and a firearms violation. On April 4, 2017, Marley moved, *inter alia*, to suppress evidence related to his arrest on February 8, 2015, as well as communications intercepted pursuant to various wiretaps [Dkt. 94]. The Court held a suppression hearing on July 20 and 21, 2017, and received post-hearing briefing. [Dkts. 137, 139, 143, 144].

For the reasons discussed below, Defendant's motion is DENIED.

## I. FACTS

### A. Early Investigation, the Undercover Call, and the GPS Tracking Order

The investigation of Marley grew out of a money laundering investigation of Joseph Stern. Memorandum of Law of the United States of America in Opposition To Defendant Jason Marley's Pretrial Motions ("Opp. Br.") [Dkt. 108] at 1. Telephone records related to Stern's telephone revealed four calls between Stern and the telephone with the call number (631) 507-4484 (the "4484 phone"); three calls occurred on the morning of February 3, 2015, and the fourth occurred on the morning of February 4, 2015. Memorandum of Law in Support of the Pretrial Motions of Defendant Jason Marley ("Def.'s Br.") [Dkt. 96] at 1; Opp. Br. at 1. Additionally, the 4484 telephone had been in contact with a second telephone number, which was known to

the Drug Enforcement Administration ("DEA") from prior investigations and which had a similar call pattern with Stern. Transcript of Suppression Hearing, July 20–21, 2017 ("Tr.") at 65. These facts led the DEA to suspect that the 4484 telephone may be connected to Stern's money laundering operation. Opp. Br. at 1; Tr. at 4–7.

After identifying the suspect 4484 phone, DEA Special Agents James Enders and Marlow Luna[1] sought an order authorizing the DEA to obtain GPS data regarding that phone ("GPS Order"). Tr. at 8. The Assistant District Attorney ("ADA") from the Special Narcotics Prosecutor's Office from whom they sought the GPS Order concluded that additional facts were needed to support a request for such an order. *Id.* The group determined that Luna would place an undercover call to the 4484 phone in the hopes of generating additional facts to support a probable cause finding. *Id.* at 9.

Luna's plan was to place a call to the 4484 telephone and to attempt to engage the person who answered the call in a conversation about illicit activities, using cryptic or coded language. Tr. 69–70. Luna testified that he typically begins these calls by offering a "password" or "pass code," by which Luna means that he tells whomever answers the call that he is calling on behalf of a named person. If the other person is willing to engage with him, that person will acknowledge that the proffered name is correct or not. *Id.* Luna usually makes up a name for this purpose, but finds the made-up name is frequently successful in starting a conversation. *Id.* Luna often speaks Spanish on these calls because, according to him, most of the people his team

---

[1]     Agent Enders has extensive experience with the relevant subject matter: he had been a DEA agent for 10 years when Marley's number was first identified in February 2015, and he has had experience investigating drug-trafficking and money-laundering organizations. That investigative experience made him knowledgeable regarding narcotics traffickers' methods and operations. *See* Def's Br., Ex. B [Dkt. 96-2] ¶ 1.

    Similarly, at this time in the investigation, Luna had been employed by the DEA for approximately 15 years and had extensive experience with narcotics trafficking investigations and related surveillance, including familiarity with traffickers' use of cell phones, numerical codes, and code words. Def's Br., Ex. A ¶ 3. *See also* Tr. at 66.

investigates speak Spanish. *Id*. at 76–78. Luna testified that, during such undercover calls, he

does not explicitly refer to an amount of cash or narcotics, nor does he mention drug-trafficking

or money-laundering activities, because doing so might make the other party nervous as "it

look[s] like you're talking to a police officer." *Id*. at 83–84.

Consistent with the practice he had used successfully before, on February 4, 2015, Luna

placed a call to the 4484 phone and stated, in Spanish, that he was calling on behalf of Julian, a

name he made up. Tr. at 70. The person who answered the call, a male with a Jamaican accent,

responded by asking if he was calling on behalf of Felipe; Luna said yes. *Id*. at 70–71. Luna

said that he had "a hundred" to give him, by which Luna intended to signify that he had

$100,000 in currency to be laundered. *Id*. The person told Luna that he was in Cleveland, and

that he would return later in the week and would meet Luna in Manhattan. *Id*. at 71. At no point

during the call did the other party ask for clarification about Felipe or the "hundred" Luna had

referenced. *Id*. at 84.

Luna conveyed this information to the ADA, who then drafted an affidavit in support of a

GPS Order; a New York state judge signed the Order later that day. Opp. Br. at 5. The

paragraph describing the call reads as follows:

> I am informed by Special Agent Luna that after obtaining the number for
> TARGET CELLPHONE 1, a member of his team provided the telephone number
> for J.D. MONEY LAUNDERER to an undercover agent ("UC") working within
> his unit in this investigation. UC holds himself/herself out in the narcotics
> community as an individual who is capable of laundering narcotics proceeds for-
> hire on behalf of illegal drug organizations. Within the past week, UC and J.D.
> MONEY LAUNDERER spoke at least one time over TARGET CELLPHONE 1
> and then arranged to meet in New York City for the purpose of transferring
> narcotics proceeds in the amount of over $50,000 within the next week.
> Additionally, UC provided J.D. MONEY LAUNDERER with a code phrase
> indicating that UC was a member of the above described narcotics proceeds
> laundering organization and that UC had been authorized to transfer money for
> J.D. MONEY LAUNDERER on behalf of the organization. As a result, Special

Agent Luna believes that both J.D. MONEY LAUNDERER and STERN are engaged in laundering narcotics proceeds.

Def's Br., Ex. A [Dkt. 96-1] ¶ 12.

Marley asserts that the call as described by Luna in the affidavit in support of the GPS Order did not occur. Def.'s Br. at 4; Affidavit of Jason Marley ("Marley Aff.") [Dkt. 97] ¶ 6. Telephone records indicate that a call was placed to the 4484 phone on February 4, 2015, at approximately the time Enders testified that Luna made the call. Tr. at 12–13; Def.'s Br., Ex. C [Dkt. 96-3]. Marley admitted that the 4484 phone was his, that he had it on the day of the call, that he was the only person who used it, and that he did not authorize anyone else to answer any of his calls. Tr. at 163. Marley testified further that he has a Jamaican accent, that he can understand and speak Spanish, and that he has in the past spoken Spanish over the phone. *Id*. at 165–66. At the suppression hearing, Marley also acknowledged he has spoken in Spanish on phone calls using coded language and discussing Mexico and drug cartels. *Id*. at 182–83, 189.

**B.      Investigation in Cleveland and the New York City Vehicle Stop**

On February 5, 2015, the day after the GPS Order was obtained, the DEA received GPS data indicating that the 4484 phone was in Cleveland, Ohio.[2] Tr. at 14. DEA agents in Cleveland surveilled the area where the GPS data indicated the phone was located and found a black Nissan Maxima with a New York license plate. DEA believed the black Maxima was being used by the person who was using the 4484 phone. *Id*. at 14–15.

On February 8, 2015, the GPS data indicated that the 4484 phone was traveling east from Cleveland through Pennsylvania, and the DEA surveilled the black Maxima as it crossed from Pennsylvania into New Jersey. Tr. at 15–16. Sergeant Richard Currao, an officer with the New

---

[2]      GPS data indicated that the 4484 phone was in New York on February 4, 2015, the date of Luna's call, and was in Cleveland the following day. Tr. at 52–53.

York Police Department, was part of the surveillance team, and his car had the closest line of

sight to the black Maxima as it exited the Holland Tunnel and entered New York City. *Id*. at 85–

88. Currao testified that traffic was not heavy, and that the Maxima changed from lane to lane,

weaving through cars without signaling as it drove eastbound on Canal Street. *Id*. at 89, 99.

Seeing this, Currao radioed his team that he was going to pull the car over, and asked for a

second car to assist. *Id*. at 89. Currao pulled the Maxima over, leaving his car protruding into

the next lane. *Id*. at 89–90. Another member of the DEA team parked his vehicle in front of the

Maxima, effectively boxing the car in. *Id*.

Marley, a passenger in the car, was on the phone with his brother at the time of the stop.

Tr. 131–32, 170. Marley testified that there was bumper-to-bumper traffic on Canal Street such

that illegal lane changes would have been impossible, but he could not explain how the agents'

vehicles were able to perform the two-vehicle stop described above if the traffic had been as he

described it. *Id*. at 151–52, 169–70.

Currao testified that he proceeded to the front passenger door and knocked on the

window, while another agent approached the driver's side. Tr. at 90–91. Currao smelled a

"distinct odor of marijuana coming from the vehicle as soon as the window went down." *Id*. at

91. He asked if there were any weapons in the car; Marley replied no and said that Currao

"could look." Currao understood Marley's statement to constitute consent to search the vehicle.[3]

*Id*. at 91, 113.

Currao asked Marley to step out of the vehicle, and he patted Marley down to check for

any weapons. Tr. at 92. Currao then suggested to his supervisor, DEA Agent Frances DiCarlo,

---

[3]     The vehicle was not registered to Marley, but he considered the car to be his because he paid for the car, and the arrangement was known to the registrant. Tr. 166–68.

who had arrived on the scene, that they should take the car, Marley, and the driver to the DEA's office nearby because it was not safe to search the vehicle on the street—they had effectively blocked traffic on Canal Street when they pulled the Maxima over. *Id*. at 17–18, 93, 106. Currao and the other agent also shared with DiCarlo the results of their interviews: the passenger (Marley) lied about where he came from, the car belonged to Marley, and the agents smelled marijuana coming from the vehicle. *Id*. at 17–18, 106, 111. Marley and the driver were arrested, and Marley, the driver, and the vehicle were all transported to the DEA office on 10th Avenue. *Id*. at 19, 56–57, 94, 96.

### C.     Searches and Statements at the DEA Office

Once safely in the parking garage at the DEA office, Enders searched Marley and found about $3,000 on his person.[4] Tr. at 19, 139. Marley was taken to the agents' office while Enders and DiCarlo began searching the car based upon Marley's prior oral consent to Currao. *Id*. at 17–18, 20–21; 62; 107–08; 113.[5] DiCarlo testified that the car smelled like marijuana at the start of their search. *Id*. at 108.

Enders found a 12" by 8" hole punched through the back seat area into the trunk. Tr. at 108–09. When the agents pulled down the back seats, the smell of marijuana intensified. *Id*. at 21, 108. Enders reached through the hole into the trunk and retrieved a bag containing about $20,000 in U.S. currency. *Id*. at 20, 108. While the car was being searched, Luna called the 4484 phone; a telephone near the car's center console rang and Enders seized it. *Id*. at 20–21, 73.

---

[4]     While it seems that Marley was asked about the source of the currency found on his person, this money was returned to him, and the prosecution is not planning to introduce evidence of Marley's statements regarding that money. Tr. at 143, 177–81, 184; Opp. Br. at 20.

[5]     Currao had told DiCarlo and Enders that the vehicle belonged to the passenger, Marley. Tr. 17–18.

After the car had been searched, Enders asked Marley whose money was in the trunk. Tr. at 22. Enders testified that he asked this as part of standard forfeiture procedure. *Id*. Marley said that the money was his, and Enders told him that DEA would be seizing it. *Id*. Marley told Enders that the cash was horse track winnings. *Id*. Enders questioned that explanation, noting that the bills were in small denominations; Marley did not respond. *Id*. at 22–23; Memorandum of Law In Reply to Government's Opposition ("Reply Br.") [Dkt. 109] at 12. Marley was not *Mirandized* prior to this exchange. Tr. at 23.

Enders prepared a DEA 12 receipt form to memorialize the seizure of the currency. Tr. at 27–28; Suppression Hearing, July 20–21, 2017, Government's Exhibit 201 ("GX201"). The form described the item seized as an "Undetermined Amount of United States Currency," and it was signed by Enders, Luna, and Marley. Tr. at 28–29; GX201. Although Marley claimed during the suppression hearing that he had not been told that the money was being forfeited, he admitted that Enders told him that the money would be seized and that he was given a receipt for the $20,000. Tr. at 147–48, 180; GX201.

Marley's pedigree information was recorded on a DEA 202 form. Tr. at 23–24; Suppression Hearing, July 20–21, 2017, Government's Exhibit 301 ("GX301"). The pedigree information included data on Marley's family and employment, and also reflected two phone numbers for him. Tr. at 25–26; GX301. The first phone number listed corresponded to the 4484 phone that was being tracked, while the other number, (347) 425-3271, corresponded to a second phone (the "3271 phone") that Marley had on his person at the time of his arrest, and which the agents initially seized. Tr. at 26, 29; GX301. Marley denied providing the agents with the phone numbers for his phones, but he acknowledged that he provided the other personal information

contained on the form, such as his occupation and the names of family members. Tr. at 146–47, 183–85; GX301.

Although Enders returned the 3271 phone to Marley later that evening, he initially decided to seize the 4484 phone, believing that it might be needed as evidence in the Stern investigation. Tr. at 29. It was determined a few days later that he should return the 4484 phone, which he attempted to do by calling Marley on the 3271 phone. He left a message, but Marley did not call him back. *Id*. at 29–30, 61. Marley contends that he never received Enders's call. *Id*. at 149.

Marley claims that, while he was being held at the DEA office, he saw agents search his cell phones, which were password-protected, and heard them discussing Cellebrite, a program used to extract information from phones. Def.'s Br. at 6–7, 29; Tr. at 140, 152–54. Enders and the other agents testified that neither they nor others who were present with Marley on February 8, 2015 searched his phones, nor did any of them have the skills to unlock a password-protected phone. Tr. at 30–31, 62, 81–82, 95, 109, 113. The technicians who have the ability to search such telephones work standard weekday hours, whereas Marley's arrest took place on a Sunday evening. *Id*. at 31. While Marley testified that he saw agents looking through his phone and specifically saw Luna do so, he also testified that Luna took the phone to a back room where Marley could not see him, and later testified that he did not actually see anyone unlock the phone. *Id*. at 152–54, 186.

DEA released Marley and the car from custody after several hours. Tr. at 27; 149–50. Marley left with the 3271 phone and the currency that had been found on his person; the DEA kept the 4484 phone and the currency found in the trunk of Marley's car. *Id*. at 27–30, 60–61, 149, 184, 189; GX201.

**D.     Subsequent Investigation**

In March 2015, about a month after Marley's arrest, DEA obtained authority to place a wiretap on Stern's telephone. The wiretap captured calls between Stern and an individual using Marley's 3271 phone during which money drops at Stern's place of business were arranged. Tr. at 32–33. That same month, agents conducting surveillance observed a man matching Marley's description driving a black Maxima and exiting the vehicle at Stern's business. *Id*. at 33.

The Stern wiretap also intercepted calls between Stern and an individual using a Jamaican phone number. Tr. at 33–34. That caller coordinated money drops with Stern for Marley and others. *Id*. at 34–35. Several months later, Enders learned that the authorities in Jamaica had initiated a wiretap on the Jamaican phone. That wiretap ultimately identified Carlton Powell[6] as the phone's owner, and it captured drug-related conversations between Powell and Marley on Marley's 3271 phone. *Id*. at 35–36. Those conversations, in turn, led the DEA to obtain authorization to wiretap several of Marley's phones. *Id*. at 36–37. The electronic surveillance of Marley allowed the DEA to identify co-conspirators, methods of operation, stash houses, and the timing of drug deliveries, and allowed it to seize narcotics and weapons and to make several arrests (including Marley). *Id*. at 37; Post-Hearing Memorandum in Opposition to Defendant's Motions to Suppress ("Post-Hearing Opp. Br.") [Dkt. 144] at 10.

In March 2016, a search warrant was obtained for Marley's 4484 phone, which was still in DEA's possession. Tr. at 30. The warrant application for the search of that telephone includes the following description of Luna's February 4, 2015, undercover call:

> On or about February 4, 2015, a law enforcement agent acting in an undercover capacity ("UC-1") placed a Spanish-language call to Subject Device-1. From my conversations with UC-1 following his call, I have learned that during that call, in substance and in part, UC-1 stated that UC-1 said he was calling on behalf of

---

[6]     According to Marley, contact information for Carlton Powell was on both of the telephones he had with him when he was arrested by the DEA on February 8, 2015. Tr. at 187–89.

"Julian."  A Spanish-speaking male with a Caribbean accent, later identified as JASON MARLEY, then responded asking if UC-1 was, in fact, calling on behalf of "Felipe," to which UC-1 responded affirmatively.  UC-1 then stated that UC-1 had "100" for MARLEY; MARLEY replied that MARLEY was presently in Cleveland, Ohio, but would return to Manhattan on the then-upcoming Friday and would meet UC-1 at 11:00 a.m. in Manhattan.

Def's Br., Ex. B [Dkt. 96-2] ¶ 13.

## II. DISCUSSION

### A.    The February 4, 2015 GPS Tracking Order

Marley moves to suppress the evidence obtained from the GPS Order, arguing that the supporting affidavit upon which it was granted contains false and misleading statements, without which there was not probable cause for its issuance.  *See* Def.'s Br. at 7–11; Post-Hearing Memorandum in Support of Defendant's Motions to Suppress ("Post-Hearing Br.") [Dkt. 143] at 3–10.

#### 1.    Applicable Legal Standard

"The Fourth Amendment to the Constitution provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"  *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quoting U.S. Const. amend. IV).  Probable cause exists if the information in the warrant's supporting affidavit supplies "a fair probability that contraband or evidence of a crime will be found in a particular place."  *Canfield*, 212 F.3d at 718 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

A defendant may challenge a search warrant when the supporting affidavit contains deliberately or recklessly false or misleading information.  *Canfield*, 212 F.3d at 717 (citing *Franks v. Delaware,* 438 U.S. 154, 164–72 (1978)).  But "[e]very statement in a warrant affidavit does not have to be true."  *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir.

1997) (citing *Franks*, 438 U.S. at 165). "To suppress evidence obtained pursuant to an affidavit

containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or

omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth;

and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable

cause finding." *Canfield*, 212 F.3d at 717–18 (quoting *United States v. Salameh,* 152 F.3d 88,

113 (2d Cir. 1998) (internal quotation marks omitted)).

To assess whether the misstatements were material to the probable cause determination, a

reviewing court sets aside the falsehoods in the supporting affidavit and examines whether the

untainted remainder supports a finding of probable cause. *United States v. Rajaratnam*, 719 F.3d

139, 146 (2d Cir. 2013) (citing *United States v. Coreas,* 419 F.3d 151, 155 (2d Cir. 2005); *United

States v. Nanni,* 59 F.3d 1425, 1433 (2d Cir. 1995)). The reviewing court should also

supplement the affidavit with any facts that were not in the affidavit but that were proven at the

suppression hearing. *Id.* (citing *United States v. Ippolito,* 774 F.2d 1482, 1487 n.1 (9th

Cir.1985)).[7]

If the corrected warrant application supports a finding of probable cause, "then the

misstatements are not 'material' and suppression is not required." *Rajaratnam*, 719 F.3d at 146;

*see also Canfield*, 212 F.3d at 718 ("The ultimate inquiry is whether, after putting aside

erroneous information and material omissions, there remains a residue of independent and lawful

---

[7]    In deciding a *Franks* motion, a court may supplement the affidavit with omitted facts that detract from the affidavit's sufficiency, *see Ippolito*, 774 F.2d at 1487 n.1, and it may also supplement the affidavit with facts that were omitted that would bolster the affidavit's sufficiency. In *Rajaratnam*, for example, the Second Circuit considered, *inter alia*, whether a wiretap application was invalid because it omitted information regarding a prior Securities and Exchange Commission investigation involving the wiretap's target. *See* 719 F.3d at 143–49. In deciding whether the omission was reckless, the Second Circuit noted that "fully disclosing the [omitted] details of that investigation would only have *strengthened* the wiretap application's 'necessity' showing." *Id*. at 155. The Court, in addition to finding that the omission was not recklessly made, also made the determination that the omitted facts, which *improved* the sufficiency of the warrant application, were not material. *Id* at 155–56. Accordingly, it is permissible to supplement an affidavit with omissions that ultimately support its validity when assessing the affidavit and the materiality of any false or misleading statements.

information sufficient to support probable cause.") (citing *United States v. Ferguson,* 758 F.2d 843, 849 (2d Cir. 1985)) (internal quotation marks omitted).  A court reviews this "corrected" affidavit *de novo*.  *Canfield*, 212 F.3d at 718.

### 2. Application

Because Marley contends that the undercover call described in the affidavit was fabricated, Marley Aff. ¶ 6, the Court begins its analysis of the GPS Order with this preliminary factual issue.

Marley's testimony that Luna's call never occurred is not credible and is contradicted by considerable evidence in the record.  Both Enders and Luna credibly testified that the call occurred; Marley testified that the 4484 phone was his, that he possessed it on the day of the call, that he was the only person who used that phone, and that he did not authorize anyone else to answer any of his calls.  Although he initially denied ever speaking Spanish on the telephone,[8] Marley ultimately admitted that, at times, he spoke Spanish on the phone and used codes during such calls, which aligns with Luna's version of the conversation.  Luna testified that the other party to the call had a Jamaican accent, and Marley has such an accent.

In addition, the telephone records confirm that the 4484 phone received an incoming call at the time Enders testified the undercover call was placed.  Luna testified that the other party said he was unable to meet because he was in Cleveland, and GPS data indicated that the 4484 phone was in Cleveland the following day.[9]  The Court is thus satisfied that the undercover call occurred and that its content was as testified to by Luna.

---

[8]     *See* Tr. at 121–22.

[9]     Although Marley stresses in his argument that the phone was in New York, not Cleveland, at the time of the call, the Court finds this argument unconvincing.  Tr. at 122–23.  The difference in timing and verb tense may have been a product of misspeaking (Marley indicated Spanish was not his first language, *see* Tr. at 121–22, so he could have easily made a mistake with the verb tense) or the person on the telephone may have said he "was" in Cleveland to indicate that he "would be" in Cleveland shortly and therefore could not meet with Luna at that time.

Nonetheless, the Court finds that Paragraph 12 of the affidavit supporting the request for the GPS Order was misleading. First, the affidavit implies that Luna, the undercover agent ("UC"), and the user of the 4484 telephone, "J.D. MONEY LAUNDERER," had an on-going relationship when, in fact, the only connection between the undercover agent and J.D. MONEY LAUNDERER was the undercover call on February 4, 2015.[10] Next, the affidavit states that UC and J.D. MONEY LAUNDERER "arranged to meet in New York City for the purpose of transferring narcotics proceeds in the amount of over $50,000 within the next week." Def's Br., Ex. A ¶ 12. That statement suggests that there had been an express conversation between the two men in which Luna told J.D. MONEY LAUNDERER that he had narcotics proceeds and that the purpose of the prospective meeting was to transfer money, neither of which actually happened. Finally, the affidavit states: "UC provided J.D. MONEY LAUNDERER with a code phrase indicating that UC was a member of the above described narcotics proceeds laundering organization and that UC had been authorized to transfer money for J.D. MONEY LAUNDERER on behalf of the organization." *Id*. That was intended to describe Luna's statement that he was calling on behalf of Julian, a name he made up, but it implied that there was a prearranged code phrase that identified UC as a member of a particular criminal organization.

In short, because the affidavit exaggerated the evidence generated by the undercover call, the Court must reevaluate whether there was probable cause for a GPS Order based on the actual facts.

---

The fact remains that the telephone was in Cleveland the following day, which is the very same location that the person on the phone supplied to Luna.

[10]     Specifically, the affidavit states that "within the past week, UC and J.D. MONEYLAUDERER spoke at least one time over" the 4484 phone. Stating that they spoke "at least" once suggests that it might have been more often, and providing a temporal limit (they spoke at least once in the last week) suggests that there were or may have been other conversations more remote in time.

There were, however, additional pieces of evidence that could have been included in the affidavit but were not. Specifically, there is no mention of the fact that DEA had identified another number, which had previously been identified in other DEA investigations, that had a similar calling pattern to the calls between Stern and the 4484 phone, and that the 4484 phone had been in contact with the other number. Second, the affidavit makes no mention of the fact that, during Luna's call, the other party did not question Luna's statement about the "hundred" that Luna had for him and that the other party appeared to understand the purpose of the call, despite its very cryptic contents.

The Court is tasked with reassessing the probable cause in the affidavit, substituting the facts as disclosed in Luna's testimony for the misleading statements in the affidavit, and supplementing the affidavit with facts that were omitted. *See Rajaratnam*, 719 F.3d at 146 (citations omitted). In doing so, the Court finds that, had all of the relevant facts been included accurately in the affidavit, the affidavit would have supported a finding of probable cause. The 4484 phone was identified during a money laundering investigation of Stern. Trained and experienced DEA agents identified a pattern of calls between Stern and the 4484 phone (and between Stern and a second suspect number that was in contact with the 4484 phone)[11] that was consistent with money-laundering activities, although, standing alone, the calling pattern was relatively benign. Luna placed an undercover call to the 4484 phone using language that he knew from his training and experience would signify to a money launderer that he was interested in setting up a meeting to launder money. The individual on the other end of this call did not question Luna, aside from correcting the name on whose behalf Luna said he was calling.

---

[11] This fact was omitted entirely, and it bolsters the DEA Agent's conclusion that the Stern-4484 phone calling pattern was suspicious. Even without this fact, however, there was adequate evidence to support a probable cause determination.

Instead, this other party arranged a subsequent meeting with him based on Luna's very cryptic statement that he had a hundred for the person. Considering all of those facts and the trained investigator's conclusion about the significance of the conversation and the contact with Stern, the court concludes that the misstatements were not material because a properly drafted affidavit would have generated probable cause.[12]

Accordingly, Marley's motion to suppress the evidence obtained a result of the GPS Order is denied.[13]

## B. The *Terry* Stop of the Black Nissan Maxima

Marley next moves to suppress any evidence obtained from the stop of his vehicle because, Marley asserts, the officers lacked probable cause or reasonable suspicion to justify the stop. *See* Def.'s Br. at 11–18; Reply Br. at 4–8; Post-Hearing Br. at 18–20.

### 1. Applicable Legal Standard

Under the Fourth Amendment, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure.'" *Whren v. United States*, 517 U.S. 806, 809–10 (1996). An officer may nonetheless "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Courts consider the totality of the circumstances when assessing the

---

[12] That said, there is little excuse for the errors that were made in the affidavit in support of the GPS Order. The call to the 4484 phone was short and occurred shortly before the affidavit was drafted. Both Enders and Luna were present with the ADA who drafted the affidavit. They should have read the affidavit to ensure that it accurately reflected the substance of the call.

[13] Because the Court finds that the misstatements were not material, and that the GPS Order was supported by probable cause, it does not reach the question of whether the misstatements were deliberately or recklessly made.

validity of a *Terry* stop.  *United States v. Sokolow*, 490 U.S. 1, 7–8 (1989) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

It is generally permissible to stop an automobile when law enforcement has "probable cause to believe that a traffic violation has occurred."  *Whren*, 517 U.S. at 810 (citations omitted).  New York traffic laws prohibit "reckless driving," which is driving that "unreasonably interferes with the free and proper use of the public highway, or unreasonably endangers users of the public highway."  N.Y. Veh. & Traf. Law § 1212.  An officer may stop a vehicle for a minor traffic offense even if such "traffic arrests [are] not necessarily part of [his or her] usual duties." *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994).  Moreover, it is constitutionally-permissible for an officer to use a traffic violation as a pretext to stop a vehicle to obtain evidence for a more serious crime.  *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir. 1998).

### 2.  Application

At the suppression hearing, there was a sharp conflict between Marley's testimony and Currao's regarding the circumstances surrounding the car stop.  Marley testified that, although he was not driving, he was sure that the driver had made no lane changes without signaling.  Tr. at 169.   The Court does not credit Marley's testimony regarding how the car was being driven. Marley admitted that he was not driving and was on the phone at the time of the stop, making him an unreliable historian regarding whether all lane changes were properly preceded by a signal.

Currao, on the other hand, testified credibly that Marley's vehicle was changing lanes and weaving through traffic without signaling.  Such conduct constitutes reckless driving under New York traffic laws in that it would interfere with the proper use of the road and would endanger

others.  *See* N.Y. Veh. & Traf. Law § 1212.  Although this was a minor traffic violation, and although the agents pursuing the 4484 phone were clearly hoping to use the traffic stop as a means of gathering evidence of drug trafficking and money laundering, the stop was legally permissible.  Accordingly, evidence derived from the stop is not subject to suppression.

## C.      Marley's Arrest and the Search Incident to Arrest

Marley moves to suppress all evidence from his arrest and the subsequent search arguing that the agents did not have probable cause to arrest him and had no legal basis to search him.  *See* Def.'s Br. at 18–19; Reply Br. at 4–8.

### 1.    Applicable Legal Standard

An officer has probable cause to arrest an individual when he or she has "knowledge or reasonably trustworthy information" such that "a person of reasonable caution" would believe that the individual has committed or is committing a crime.  *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  A court considers the facts known by the officer at the time of the arrest, and whether they objectively supplied probable cause.  *Id*. at 153 (citing *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004)).  Having made a lawful arrest, law enforcement may conduct a warrantless search incident to an arrest.  *United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017) (citing *Riley v. California*, ──U.S. ──, 134 S. Ct. 2473, 2482 (2014)).

### 2.    Application

The DEA had a legal basis to arrest Marley.  Multiple witnesses credibly testified at the suppression hearing that the interior of the vehicle smelled of marijuana.[14]  The agents were

---

[14]     At the suppression hearing, Marley denied he had been smoking marijuana prior to the stop, but he admitted that he had allowed friends, who may have transported marijuana, to use his vehicle in the past.  Tr. at 174–75.

therefore justified in believing that Marley had committed or was committing the crime of possession of marijuana.  In short, Marley's arrest and the subsequent search incident to the arrest were lawful, and the evidence derived from the arrest, including the search of his person, is not subject to suppression.

## D.    Search of the Vehicle and the Evidentiary Seizures

Marley asserts that he did not consent to the search of his vehicle, and, therefore, any evidence seized from that warrantless search should be suppressed.  *See* Def.'s Br. at 19–20; Reply Br. at 7–8.  He also asserts that the seized items were impermissibly retained.  *See* Def.'s Br. at 20–21.

### 1.    Applicable Legal Standard

While warrantless searches are generally prohibited under the Fourth Amendment, a warrantless search may be undertaken with valid consent.  To prove consent, the government must prove by a preponderance of the evidence that the party providing the consent had either actual or apparent authority to consent to the full scope of the search.  *United States v. Sparks*, 287 F. App'x 918, 920 (2d Cir. 2008) (citing *United States v. Matlock,* 415 U.S. 164, 171 (1974)).  An individual has apparent authority to consent when the officer receiving the consent has sufficient facts, at the time of the consent, to reasonably believe the party providing the consent had authority over the object of the search.  *Sparks*, 287 F. App'x at 920 (citing *Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990)).  An officer conducting a consent search may seize objects containing or constituting evidence of a crime.  *See United States v. Ortiz*, 112 F.3d 506 (2d Cir. 1997) (unpublished table decision) (affirming the denial of a motion to suppress $28,000 cash seized from defendant's vehicle when defendant had consented to the search and was under investigation for drug and money laundering crimes).

## 2. Application

The agents testified that, during the traffic stop, Marley identified himself as the owner of the car and consented to a search of the vehicle for weapons. *See* Tr. at 17–18; 20; 62; 107; 113. Based on Marley's self-identification as the owner, Currao reasonably believed that Marley had actual or apparent authority to consent. Currao relayed Marley's consent to his supervisor, DiCarlo, and it was on the basis of this consent that Enders and DiCarlo subsequently searched the vehicle. While Marley denies that he consented, his testimony on that point was not credible, whereas Currao's was. Therefore, the search of the vehicle was proper because Marley consented, and the Court does not reach the question of whether other conditions, such as the odor of marijuana in the car, provided probable cause to search.

During the course of the search, Enders located a bag containing $20,000 in cash in the trunk, as well as the 4484 phone in the car's center console. Enders located the cash through a hidden hole that had been created between the car's rear seat area and the trunk. Enders identified the 4484 phone when Luna called the telephone's number and a phone rang inside the car. Both the money, which had been hidden in the secured trunk, and the phone, which the agents believed had been utilized in narcotics trafficking and money laundering, were permissibly seized during the consent search because they were evidence of the crimes under investigation.[15] Even assuming, *arguendo*, that Marley's consent was limited to a search for

---

[15] Marley also argues that the agents did not follow the proper procedures after they initially located the 4484 phone and the cash, including asserting that he was never told that the $20,000 was being forfeited. *See* Reply Br. at 9. The evidence suggests otherwise, but, regardless, failure to follow DEA procedures is not a basis to suppress evidence.

weapons, the 4484 phone and cash were seized in plain view,[16] as the officers were permissibly

searching the vehicle for weapons when they found that evidence.[17]

## E.  *Miranda* **and Marley's Statements**

After Enders found currency in the trunk and finished searching the vehicle, he went to

Marley's location.  He asked Marley whose money was in the trunk, and Marley admitted that it

was his.  Enders then told Marley the money would be forfeited, after which Marley stated that

the cash was his horse track winnings.  Marley did not respond when Enders questioned the

racetrack explanation inasmuch as the cash was in small denominations.  Marley moves to

suppress his statements arguing that he was interrogated in custody without having been

*Mirandized*.[18]  *See* Def.'s Br. at 22–23; Reply Br. at 10–13; Post-Hearing Br. at 16–18.

### 1.  **Applicable Legal Standard**

Under *Miranda v. Arizona,* "the government may not use any statements stemming from

custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

effective to secure the privilege against self-incrimination."  *United States v. Stroman*, 420 F.

---

[16]    An officer conducting a search may seize an item in "plain view" without a warrant if "it is immediately apparent that the object is connected with criminal activity" and if the officers viewed the object lawfully, in that they "have not violated the Fourth Amendment in arriving at the place from where they can see the object."  *United States v. Andino*, 768 F.3d 94, 99–100 (2d Cir. 2014) (quoting *United States v. $557,933.89, More or Less, in U.S. Funds,* 287 F.3d 66, 81 (2d Cir. 2002)).  Accordingly, seizure of everyday objects in plain view, including cellular phones, is justified "where the officers have probable cause to believe that the objects contain or constitute evidence" of a crime.  *United States v. Babilonia*, 854 F.3d 163, 180–81 (2d Cir. 2017) (citing various cases in which cell phones were justifiably seized in investigations of narcotics conspiracies).

[17]    Enders initially planned to seize the 4484 telephone as evidence in the Stern investigation, which would have been permissible for the reasons described above.  Once it was determined that the phone would not be needed, Enders attempted to return the phone to Marley, but Marley never called him back.  Although Marley claims he never received such a call, the Court does not find his testimony to be credible.  In any event, the phone was lawfully seized.

[18]    As noted above, because the prosecution does not plan to introduce any statements made regarding the currency that Enders found on Marley, the Court will not analyze whether those statements should be suppressed.

App'x 100, 102 (2d Cir. 2011) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)) (internal quotation marks omitted).

A court examines all the circumstances surrounding a potential interrogation to determine whether the suspect was in custody, and considers whether a reasonable person in that situation would have felt that he or she could end the interrogation and leave. *Tankleff v. Senkowski*, 135 F.3d 235, 243 (2d Cir. 1998) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). For *Miranda* purposes, an interrogation includes express questioning as well as its functional equivalent, namely "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rosa v. McCray*, 396 F.3d 210, 220–21 (2d Cir. 2005) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01(1980)).

Accordingly, not all questions constitute interrogation. For example, "[t]he collection of biographical or pedigree information through a law enforcement officer's questions during the non-investigative booking process that typically follows a suspect's arrest . . . does not ordinarily implicate the prophylactic protections of *Miranda* . . . . Such interrogations customarily involve questions of a different character than those that are normally and reasonably related to police administrative concerns." *Rosa*, 396 F.3d at 221 (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990)).

### 2.  Application

Marley was not free to leave during the time he was held at the DEA's office, and he was not read his *Miranda* rights.  Therefore, the question is whether Marley's statement regarding the ownership of the money and its provenance were in response to interrogation.

Enders testified that his purpose was to gather information that he needed to process the seizure of the money.  Marley contends that Enders's questions about the currency invited incriminating statements because the investigation involved allegations of money laundering.  *See* Reply Mem. at 11–12.  The Court finds this argument unconvincing because the evidence is clear that Enders did seize the funds, undercutting the implication that his questions were pretext to engage Marley in unwarned conversation in the hope of obtaining an incriminating statement.[19]  Courts have found that routine booking questions and statements about law enforcement procedure do not constitute interrogation for the purpose of *Miranda*.  *See Muniz*, 496 U.S. at 601–02; *United States v. Gonzalez*, 764 F.3d 159, 166–67 (2d Cir. 2014).  Similarly, this Court finds that Enders's questions regarding money to be forfeited did not constitute interrogation.[20]

### F.    Searches of Marley's Phones

Marley claims that his telephones were impermissibly searched when he was held at the DEA Office.  Those unlawful searches, he claims, disclosed the telephone number of the 3271 phone that was in his possession when he was arrested, and revealed his association with Carlton

---

[19]     Additionally, this conversation took place in front of Scully, the driver, and not in the context of a more traditional one-on-one interrogation.  Tr. at 181.  This further indicates that Enders was not seeking to interrogate Marley for the purpose of obtaining an incriminating statement.

[20]     Enders's follow-up question regarding how the cash could be racetrack winnings given its small denominations does not appear to be administrative.  Because Marley did not respond to that question, there is no statement for the Court to analyze for suppression purposes.  Whether Marley's silence in response to that question would be admissible is beyond the scope of this opinion.

Powell. Marley's theory is that any investigation related to the 3271 phone and to Powell must be suppressed as fruit of the poisonous tree.[21]  *See* Def.'s Br. at 23–28.  Marley also challenges the search of the 4484 phone that unquestionably occurred pursuant to a warrant in March 2016. *See* Def.'s Br. at 7–11.

### 1.  Applicable Legal Standard

Officers must generally obtain a warrant to search a cell phone and may not conduct a warrantless search of a cell phone's digital data as a search incident to an arrest.  *See Riley*, 134 S. Ct. at 2484–85.  "Absent 'exigent circumstances' or similar 'case-specific exceptions,' law enforcement officers are not permitted to search an individual's cell phone without a warrant." *Port Auth. Police Benevolent Ass'n v. Port Auth. of New York and New Jersey*, No. 15-CV-3526-KMW-RLE, 2017 WL 4403310, at *4 (S.D.N.Y. Sept. 29, 2017) (citing *Riley*, 134 S. Ct. at 2494).  "[T]he Government's interest in preventing the destruction of evidence is considerably lessened once a cell phone has been secured."  *United States v. Cushnie*, No. 14-CR-119-PGG, 2014 WL 7447149, at *9 (S.D.N.Y. Dec. 31, 2014) (citing *Riley*, 134 S. Ct. at 2486).

### 2.  Application

Marley's assertion that the agents in the DEA office searched his password-protected phones is baseless speculation.

Enders and the other agents testified credibly that they knew of no one at the DEA office the evening of the arrest who had broken through the passwords and searched the phones, let

---

[21]　　"To safeguard Fourth Amendment rights, the Supreme Court created an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial."  *United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015) (quoting *Herring v. United States*, 555 U.S. 135, 139 (2009)) (internal quotation marks omitted). The purpose of the rule is to deter unlawful police conduct and prospectively bolster the Fourth Amendment's guarantees.  *Bershchansky*, 788 F.3d at 112 (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).  The exclusionary rule governs both primary evidence as well as "evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'"  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)) (internal quotation marks omitted).

alone had the training to do so.  More importantly, they testified that the DEA staff members

with such training were not working that evening, as those technicians only work on weekdays

during standard business hours, whereas Marley's arrest took place on a Sunday evening.  And

while Marley testified that he saw agents examining his phone, naming Luna in particular, he

also testified that Luna took the phone to a back room where Marley could not see him, and later

testified that he did not actually see anyone unlock the phone.  Tr. at 152–54, 186.

Marley speculates that the DEA must have searched his phones that night because the

investigation identified (and ultimately targeted) his 3271 phone as well as Powell's telephone,

the number for which appeared in Marley's phones.  The evidence before the Court points to

more cogent explanations for how this came to be.

As for the 3271 phone, the Court finds that Marley provided the agents with this number

himself during routine pedigree questioning.  The DEA 202 form contains detailed information

on Marley's personal background in addition to reflecting the 4484 and 3271 telephone numbers.

Marley denied that he gave DEA those numbers, but he conceded that he provided other

information on the form, such as his occupation and the names of family members.  *Id*. at 146–

47, 183–85.  It would be odd for the two phone numbers listed on this standard intake form to

have been gathered through an unlawful search by agents who lacked the skills to do so, but the

balance of the information on the form to have come from Marley himself through routine

questions and answers.

As to Powell's phone, Enders testified credibly that DEA learned of Powell through the

Stern wiretap, which captured calls between Powell and Stern discussing money drop

arrangements for Marley and others.  Those calls led the Jamaican authorities to wiretap

Powell's phone, which, in turn, identified Powell as its owner.  The Court does not credit

Marley's unsupported speculation that Powell's contact information was unlawfully extracted from his phones on the evening of his arrest.

Because the Court finds that there was no unlawful search of the phones, Marley's motion to suppress all communications intercepted on the 3271 phone and from the wiretap of Powell's phone must also be denied.

Lastly, the Court considers the March 28, 2016, search warrant for the 4484 phone, which Marley challenged on the same grounds as he challenged the February 4, 2015, GPS Order. Not only does the same analysis apply to the search warrant, through which the Court would substitute corrected statements into the warrant application and find probable cause, but the March 2016 affidavit itself described Luna's call much more accurately than the February 2015 affidavit did.[22] In any event, for the same reasons that the GPS Order was supported by probable cause, so was the search warrant for the 4484 phone.

## H.    Additional Motions

In addition to Marley's claims presented and analyzed above, his pretrial motion also asked the Court to dismiss the indictment against him, asserting that, if the evidence derived from his arrest were suppressed, there would be insufficient evidence to support his prosecution; to preclude the Government from introducing evidence as to his previous criminal charges and convictions, as well as evidence of other bad acts or uncharged crimes; and to compel the prosecution to reveal its 404(b) evidence. *See* Def.'s Br. at 28–32.

For all the reasons stated above, the Court declines to dismiss the indictment against Marley. The Court also finds Marley's request for 404(b) evidence moot in light of the

---

[22]      The March 2016 affidavit, *inter alia*, refers to Luna's proffering of "Julian" and the other party's correction of "Felipe," and notes that Luna said he had "100" for the other party rather than a specific amount of money. *See* Def.'s Br., Ex. B ¶ 13.

Government's Motion in Limine.  The Court will address the issues raised by Marley with regard to previous charges and convictions and other bad acts in its decision on that motion.

### III. CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion to suppress.  The Clerk of Court is directed to terminate ECF No. 94.  The parties are ordered to meet and confer, and must send the Court a joint letter by November 9, 2017 regarding their expectations for the length of trial, as well as three proposed dates when all parties are available for trial.

**SO ORDERED.**

**Date:  October 31, 2017**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**