UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x

UNITED STATES OF AMERICA

   -against-                                Dkt #:  16-CR-374

JASON MARLEY,

                     Defendant.
---------------------------------------------------------------------x

# DEFENDANT'S SENTENCING MEMORANDUM

BRYAN KONOSKI
Treyvus & Konoski, P.C.
*Attorney(s) for the Defendant*
305 Broadway, 14th Floor
New York, NY 10007
(212) 897-5832
Fax: (718) 668-1094
Email: bkonoski@aol.com

**Table of Contents**

I.      PRELIMENARY STATEMENTS……..…………………………………………..3

II.     RELEVANT FACTS……..……………………………………………………....3
        (A)Facts as Set Forth in the PSR……………..…………………………………3
        (B) Drug Weight Calculation…………………………………………………….5
                The Government's Estimate……………………………………………..5
                The Defense Estimate…………………………………………………9
        (C) Firearm Violation…………………………………………………………..19
        (D) Obstruction of Justice …………………………………………………...22
                Page 12 …………………………………………………………………23
                Page 16 …………………………………………………………………23
                Page 19 …………………………………………………………………24
                Page 24……………………………………..………………………24

III.    THE DEFENDANT'S SENTENCING GUDIELINE CALCULATION ………..…25

IV.     A SENTENCE OF 10- YEARS INCARCERATION
        (THE MANDATORY MINIMUM) IS APPROPRIATE
        DUE TO THE HISTORY AND CHARACTESITICS OF
        THE DEFENDANT (18 U.S.C. § 3553(a)(1))………………………………………27
        (1) Mr. Marley has no Significant Family Ties……………………………………27
        (2) Mr. Marley has a Substance Abuse Problem ………………………………...30
        (3) Mr. Marley has no Disciplinary History While in Custody …………………….31

V.      A SENTENCE OF 10-YEARS' IMPRISONMENT
        (THE MANDATORY MINIMUM) IS APPROPRIATE
        DUE TO THE NATRUE AND CRICUMSTNACES
        OF THE OFFENSE. (18 U.S.C. § 3553(a)(1)) …………………………………...32

VI.     A SENTENCE OF 10-YEARS' INCARCERATION
        (THE MANDATORY MINIMUM) IS APPROPRIATE
        (18 U.S.C. § 3553(a)(2)) ………………………………………………………35
        (1) To Reflect the Seriousness of the Offense, to promote
            Respect for the Law and to provide just Punishment for
            the Offense …………………………………………………………35
        (2) To Afford Adequate Deterrence to Criminal Conduct ………………………35
        (3) To Protect the Public from Further Crimes of the Defendant …………………...36

VII.    OBSTRUCTION OF JUSTICE POINTS SHOULD NOT
        BE INCLUDED IN THE SENTENCING CALCULATION ……………………36
        Page 12 ………………………………………………………………………38
        Page 16 …………………………………………………………………………39

Page 19 …………………………………………………………………………40

Page 24 …………………………………………………………………………41

VIII.   A VARIANCE IS WARRANTED BECAUSE THE
DEFENDANT'S CRIMINAL HISOTRY SCORE
OVERSTATES THE SEVERITY OF HIS PAST
CRIMINAL CONDUCT ……………………………………………………42

IX.   CONCLUSION …………………………………………………………..43

# I.

## PRELIMINARY STATEMENT

Jason Marley was arrested on April 19, 2016.  He was charged in a two-count indictment. Under Count One, he was charged with Conspiracy to Distribute and Possess with Intent to Distribute Marijuana, Cocaine, Cocaine Base, and Heroin, in violation of 21 USC § 846 and 841(b)(1)(B)).  Under Count Two, he was charged with Using and Carrying Firearms During and in Relation to a Drug Trafficking Crime in violation of 18 USC § 924(c)(1)(A)(i) and (2).

A pre-trial suppression hearing was held on July 20 and 21, 2017.  The pre-trial motions were denied, and the case was scheduled for trial.

A trial was conducted from March 12 to March 19, 2018.  Mr. Marley was convicted of the crimes charged after trial.

# II.

## RELEVANT FACTS

### A.  Facts as Set Forth in the PSR.

From approximately February 2016 through April 2016, Jason Marley was the manager and supervisor of a drug trafficking conspiracy, which mainly focused on the distribution of marijuana but also involved the distribution of cocaine, cocaine base (crack), and heroin.  (PSR ¶ 12).

Mr. Marley received large quantities of marijuana on a nearly weekly basis from his suppliers on the west coast.  He would store the marijuana in at least two locations:  the apartment in Brooklyn where two of his children and their mother, Radianna Thompson, lived; and the Brooklyn apartment of Elaine Heron, who was a mother figure to Mr. Marley.  In addition to storing marijuana for Mr. Marley, Ms. Thompson brought drugs to dealers and collected money from them, and Ms. Heron reported to Mr. Marley when runners came by to pick up drugs.  Nearly

every week, Mr. Marley and his associates would bring large boxes filled with marijuana to Ms. Thompson's and Ms. Heron's apartments, weigh the marijuana, and stor it in quantities of half a pound to two pounds.  Denille Jameson was also alleged to have assisted Mr. Marley by stashing drugs and drug trafficking tools at her residence in Brooklyn. (PSR ¶ 15)

Depending on the quality of the marijuana, it sold for between $700 per pound to over $2,000 per pound.  (PSR ¶ 15).

Mr. Marley had the marijuana shipped to multiple locations in and around New York.  One witness at trial testified that several boxes would be sent to the freight forwarding business where the witness worked, which was located near John F. Kennedy Airport.  The witness testified that Mr. Marley had multiple boxes sent to the business on a weekly basis.  The witness also testified that when he told Marley he no longer wanted to be involved, Mr. Marley made comments about the witness's family and house, which he interpreted as a threat.  (PSR ¶ 16).

During the course of its investigation into Marley's activities, the Government wiretapped several of his cell phones.  The wiretaps revealed many conversations between and among Mr. Marley and his associates discussing the delivery and sale of narcotics.  Mr. Marley often discussed the narcotics using code words, such as "food" (marijuana), "Chinese food" (heroin), "Frank Lucas" (also heroin), "the whites" (cocaine), and "the hard" (crack cocaine).  In one sequence of wiretaps, Mr. Marley and his associates coordinated the picking up of narcotics that had been sent to Philadelphia.  Agents tried to pull over the associate, who threw the box of marijuana into a yard.  Agents recovered the box, which contained approximately 35 pounds of marijuana.  (PSR ¶ 17).

Mr. Marley possessed firearms in connection with his drug business.  When agents conducted searches of locations used by him, they recovered multiple firearms.  Two of the firearms – including one found in Ms. Williams' apartment in Queens – had Mr. Marley's DNA on them.  Two witnesses testified at trial that Mr. Marley possessed the firearms, in part, for protection while he was dealing drugs.  For example, if Mr. Marley met with a customer he did not know, he carried a gun.  (PSR ¶  18).

In addition to finding firearms, agents recovered over 75 pounds of marijuana, as well as 103.3 grams of cocaine, and 3.5 grams of crack.  Marley kept drugs, a gun, a loaded clip, and ammunition in a large blue shipping barrel in his children's bedroom in the apartment where they lived with Ms. Thompson.  (PSR ¶ 19)

## B.  **Drug Weight Calculation.**

- **The Government's estimate:**

Based on testimony at trial and the quantity of drugs seized, the Government conservatively estimated that Mr. Marley conspired to distribute approximately 325 kilograms of marijuana.  (PSR ¶ 19).  To reach this calculation, the Government argued as follows (*see* Government's Summation, Page 496 to 500):

\*\*\*

"Now, let's go back to that box that Mohammed threw into the yard in the Bronx.  What do we know about it?  We know that Special Agent Quinn found it and recovered it.  He opened it, and he found 35 pounds of marijuana inside.  35 pounds, or just about 16 kilograms, from just that one box.  That box also confirms what we know from the calls: This was just one of the three boxes, three out of three, written write on the box.

Those other boxes?  They weren't recovered.  But you know they contained large amounts of marijuana.  How do you know?  Your common sense and the calls tell you.  No one ever said anything about the one box of marijuana and the two boxes of something else.  All the calls just talked about three boxes.

You also know all three boxes contained marijuana because the defendant was clearly concerned about all of them.

We just talked about the call where the defendant called Mars to tell him what happened to Mohammed and to tell him to take roads, roads, roads, to change his course.  We can reasonably estimate that those two boxes, just like the box seized from the Bronx, contained about 16 kilograms of marijuana, which means that three boxes together would be about 48 kilograms of marijuana.  48 kilograms of just one pickup on just one day of this conspiracy.  48 kilograms that have nothing at all to do with J&J.  This is an entirely separate source of supply.

Now, how else do you know the defendant conspired to distribute well beyond 100 kilograms of marijuana?  You know because of the marijuana seized on just one morning from the apartments of just two of the defendant's coconspirators:

Ms. Heron's apartment on East 21st Street and Ms. Thompson's apartment on Kenilworth Place.  In our opening, we told you that the evidence would come in bits and pieces during trial.  Because of this, you might not have noticed that the Court-authorized searches of apartments in this case all happened on the same day, April 28, 2016.  At just one apartment that morning, Ms. Heron's apartment, in the defendant's bedroom and in the dining room, the DEA seized about 100 pounds, or 45 kilograms, of marijuana, along with scales, a vacuum sealer, and mail in the defendant's name. This mail, his name, that apartment's address, Government Exhibit 114.

Why does that mail matter?  Because it shows you that the defendant stayed in this apartment.  This is his marijuana. At another apartment, Ms. Thompson's apartment, in that blue barrel, the blue barrel containing the defendant's DNA on his gun, the DEA seized another four kilograms of marijuana along with yet more scales.  Who needs this many scales?  Only someone who's moving pound, after pound, after pound of drugs.  Nearly 50 kilograms of marijuana on just one morning from just two locations used by the defendant. 50 kilograms that you know are in addition to the nine boxes of marijuana collected from J&J in addition to the 16 kilograms of marijuana from that yard in the Bronx in February.

So, to recap:  You have an estimated 227 kilograms in total from J&J.  You have about 48 kilograms from those three boxes from Philadelphia.  You have about 50 kilograms from just those two apartments on just that one day in April 2016. That's over 300 kilograms.

And, remember, that's conservative.  It assumes that those boxes from J&J were just ten pounds.  It counts just those three boxes from Philadelphia from one day in February 2016 when you know the conspiracy went on for months. And it counts marijuana from two apartments on one day in April 2016 when you know the defendant constantly was replenishing his supply of drugs.

You don't need any more to know that the defendant distributed or conspired to distribute more than 100 kilograms. But you have so much more.  We have not even talked about the testimony of Ms. Heron and Ms. Thompson.  You don't need their testimony to know that the defendant agreed with others to move well beyond 100 kilograms, but you've got that as well. Ms. Thompson, the mother of two of the defendant's children, told you that in early 2015, the defendant moved into the apartment on Kenilworth Place.  A few weeks later, the boxes started to arrive, box after box every other week, each box containing 15 to 20 bags, each bag containing

one half pound to two pounds of marijuana. She told you how the defendant and his coconspirators brought those boxes of marijuana into her apartment, how the defendant and his workers removed the marijuana from those boxes and bagged it for sale, storing it in that blue barrel that the defendant kept in the children's bedroom, how at the defendant's direction, she met with the defendant's customers, handing over marijuana and collecting payment for that marijuana. She also told you how the defendant directed her to go to the bank to make payments for the marijuana because she was the only person who had a legitimate job. And that's exactly what you saw in text messages, text messages in which the defendant sent her names and bank accounts into which she transferred the defendant's drug money. Here, we see the name Latonya Hamilton and a bank account number. Here, we see Yashika Fearon and another bank account number. Remember, there is no dispute that these text messages are from the defendant's phone, this phone, Government Exhibit 133. That's the phone that the DEA seized from the defendant on February 8, 2015, the day he was stopped on Canal Street. The parties stipulated that these messages are from that phone, the defendant's phone. You also heard from Ms. Heron about the defendant's drug business. Ms. Heron, a mother figure to the defendant, she told you that the defendant paroled into her apartment about five years ago, staying in that back bedroom. She explained that they had a fight, but he moved back sometime in mid-2015. She told you that soon thereafter, the defendant began bringing boxes of marijuana into the apartment, and he would bring two boxes a week and sometimes a box every other day. She told you how the defendant and his workers would take the marijuana out and bag it into one-pound Ziploc bags, how the workers would then come to collect those bags from her apartment multiple times a day."

- **The Defense estimate:**

Based on testimony at trial and the quantity of drugs seized, the Defense estimated that Mr. Marley conspired to distribute less than 100 kilograms of marijuana.  Although the Defense understands that the Jury found that Mr. Marley conspired to distribute more than 100 kilograms of marijuana, the Jury did not specifically find that the Government's argument regarding a total weight of 325 kilograms or more was correct.  For that reason, it is important for the Court to consider the Defense argument regarding the total weight of marijuana that was part of the conspiracy. The Defense argued as follows (*see* Defense Summation, Page 519 to 533):

***

"So, we know that this conspiracy starts, and I'm sure you'll hear during the judge's charge that the conspiracy covers a timeframe from 2015 until April of 2016.  So the question is during that time period what was the total weight of the marijuana?

Focusing on the marijuana now because there will be three options on the verdict sheet. The three options are, you can pick, if you find Mr. Marley guilty of the conspiracy, then there are three questions under the issue of the weight of the marijuana.  One is whether the conspiracy -- the quantity of marijuana for the -- which the defendant was responsible for is a hundred kilograms or more of marijuana, that's one option; or second option is 50 kilograms or more but less than a hundred kilograms; and the third option is less than 50 kilograms.

So the weight of the drugs, the weight of the marijuana in particular, is extremely important because it's not so simple to go back into the jury room and say: Well, I heard this evidence; yeah, I think he was dealing drugs; yeah, I think he dealt with a number of people; yeah, I think he's

guilty of conspiracy.  It's not just that.  Then the question becomes, even if you find him guilty, and, again, guilt or innocence is up to you, if you found him guilty, then the question is:  What's the weight?  And the government's math is wrong.  It's just not correct.

We know that there was a number of packages or volumes of marijuana.  There was marijuana recovered from Elaine Heron's apartment, Williams' apartment, Thompson's apartment in the blue bucket.  Then there was marijuana that was thrown out the car window in the Bronx. But when you take all that and put it together, the total amount of kilograms for those items, for Heron's apartment, Williams' apartment, Thompson's apartment and the amount that was thrown out the car window in the Bronx is about 65 kilograms is a rough estimate. 65 kilograms of marijuana. So now you have the question of what about the other 35 to get over a hundred, 36 to get over a hundred?

So you've got 65, roughly 65 kilograms.  But it's the timeline of events that I'm now going to explain to you that shows you why the government hasn't satisfactorily proven anything over a hundred kilos and, in fact, it's significantly under a hundred kilos or certainly on this evidence there's insufficient proof of that.

To start with, Ms. Thompson, Raidy Thompson, testified that the drugs coming into the apartment started around January, February of 2015.  Now, I cross-examined her and asked her whether she ever told the government that it actually started in the summer of 2015.  And then she danced around that and said I don't remember that, I don't remember that, it was earlier, and then she tried to stick to the January, February timeline.  But, January, February, or the summer, doesn't matter all that much because we're still talking about less than a hundred kilos.

The testimony from Griffith and Thompson was that when the marijuana quantities first started coming in, they were very small.  It was only over time that they became larger.

And that makes sense.  Mr. Marley gets out, clearly out of jail, and he's on parole.  He goes to Heron's apartment.  Then he gets out for a period of time.  And he returns a few months later. And then some point at that, maybe there's some attempt at building up the drug business.  But he's effectively a startup business.  Yes, the business happens to be marijuana.

But it's a business.  And like any other business, any business, whether you're running a deli, whether you're running a law practice, whatever it is, there is the beginning stages of those businesses.  You don't just open up your doors and suddenly you're flooded with customers and clientele and people on the street trying to buy drugs from you.  You're not flooded with drugs coming in your door.  It doesn't happen like that. This is like any other business.  You need to make connections. You need to get your product.  You need to sell your product. So, of course, whatever amounts were coming in in the earlier stages of this would have been minuscule. So when you hear all this testimony about 10 pounds here, 20 pounds there, these are large amounts of drugs, at which time periods are we talking about, with specificity?  We don't have that on this evidence.

The largest shipments, according to Thompson and Griffith, that were coming in was starting in 2016.  And there's a reason for that.  If you recall the testimony, starting in 2016 Mr. Marley became excited about something. There was something that happened around January of 2016 that wasn't happening before, and that's that Mr. Marley made a connection.  That connection was with Mex, also known as Poppa. That occurs in about January of 2016.  That happens to also be when the volume of marijuana picks up, January of 2016.  And this is a very short-lived time period.

The government is making like well this is one week out of the entire conspiracy.  Yes, it is one week.  That is the week.  The evidence shows that that is the week where things are

happening.  Things are going on because of that connection with Mex, also known as Poppa.
Griffith testifies that there's a number of rapid shipments that occurred early in the new year and
those are in evidence on the recording, right.  These shipments start: January 6, two boxes; January
7, two boxes; January 8, four boxes; January 12, one box; for a total of nine boxes in that short
week that the government gets up here and tells you well that's the week.  It's one week.  Now just
multiply that exponentially on through 2015 and all through the rest of 2016 up until the end of
the conspiracy and it's just hundreds and hundreds of kilos.

No.  It doesn't work that way.  This was the shipments that are coming in.  I assert to you
on this evidence what you have it's clear that what's coming in are the shipments from Mex, from
that new relationship.  This is where he has the opportunity to try to build the business for the first
time, January of 2016.  He gets nine boxes.  Up to January 12.  Then there's another two boxes
that Griffith tells you come in on February 16.  That's a total of eleven boxes. The average amount
or weight of those boxes according to Griffith is about ten pounds.

The government used that ten point mark for their calculations.  You've got eleven boxes
at ten pounds each, that's 110 pounds.  That's 110 pounds of marijuana. But we know that there's
packing material.  So we don't really know the weight of the marijuana inside the box. We know
that the box that was thrown out the window of the car had clothing and stuff stuffed in there.  So
we don't really know the true weight of the marijuana in those boxes.  It's just a rough rule of
thumb estimate.  Really at the end of the day it could be five pounds, six pounds.  You don't know
what's inside the box.  So you can't just say it's definitely 110 pounds, that's got to be the weight
as a rough estimate. It could be significantly less than that as the total amount of marijuana.  But
nonetheless these are the boxes coming in, in the beginning of 2016.

And as you recall, as I mentioned to you when I was talking about Griffith and his credibility, there was a conversation between Griffith and Mr. Marley where Mr. Marley is like: Look, it's the beginning of the new year, let's keep this thing flowing, let's make good things happen. Excited about the business opportunities.

Also in January, I believe it was for January 12, Mr. Marley, in transcript GX 314T-1, is on the phone talking to Raidy; tells Raidy: Look, Poppa is coming. Cook some fish. He's coming in. That's January 12. Comes in. Fish is cooked.

Raidy goes in the next room. The door is closed. Money is counted and given to Mex. For what? That's January 12. You have January 6, 7, 8, and 12 are when those boxes come in. Mex comes in and he gets paid for those very boxes that come in. That's the new connection. He's coming in, Marley makes good on the money. And they want to keep things flowing. During this time period Griffith is also properly paid. I assert to you the evidence shows he's properly paid. He claims that through the course of this conspiracy he receives 50 boxes in total. I assert to you that on the evidence you have before you in this case that's nonsense.

We know that he's getting boxes because he's interested and involved. He asked for his money. He says we'll square up later. He has these discussions. He voices concern about the payment on those boxes. Mr. Marley tells him: Yeah, we'll square up. Mr. Marley is concerned. He wants to make sure things keep flowing. This is an ongoing exchange. And that's not something that you would expect from somebody stiffing his worker, especially if you want to keep things flowing with this new supplier. But that statement of 50 boxes is an embellishment. That's one of the lies that you have to really think about. And here's why you know that. If there's 50 boxes, we're talking about eleven from January to February. Fifty other boxes. He's not going to be sitting there doing this without getting paid. But he got two thousand to four thousand dollars in total for the entire

conspiracy.  Divide that up by the eleven boxes.  That's $181 if it's two thousand dollars; $363 if it's four thousand. That's pretty much right there at the two hundred, three hundred dollar mark. That's what he told you that he negotiated.

Keep in mind that was a negotiation.  Mr. Marley didn't come to him and say I will give you two hundred, no I will give you three hundred.  If you're abusing somebody, why are you going to do that at all?  You don't. Griffith negotiated that rate of three hundred dollars and he got it.  Gets eleven boxes.  He gets two to four thousand dollars.

So why the bracket?  Why is it that he doesn't know I got two thousand or I got four thousand?  Because he is splitting some of that money off with other people who helped him.  So he doesn't -- he may not remember if he got two thousand or four thousand, but that's the totals. He may have gotten two thousand because he split off half with another guy. Might have been closer to four thousand if he didn't split off that much.  But at the end of the day he got paid what he was supposed to get paid.

And I assert to you on the evidence that's before you there was never 50 other boxes.  That's just to make Mr. Marley look bigger and badder than he is to satisfy the government, so he could get his noncooperation or nonprosecution agreement. The money he received, two hundred, three hundred dollars is spot on with what was negotiated. And that's pretty much, I assert to you, almost everything that was ever received from Griffith.  Griffith wasn't the big trafficker here.  I assert to you on the evidence you have there's nothing here at all, and it's the government's proof.  They have to prove it to you.

By February 16 of 2016 all the boxes of drugs, the marijuana is going to Ms. Heron's apartment because she's the stash house.  But at this point in time Marley is having trouble with his business.  Remember, it's a startup.  Troubles didn't stop when he tried to make that connection

with Mex. They continued.  In fact, they worsened in some regards. About a month after meeting Poppa on January 12 when he came over for the fish and to get money, we're now at about February 10 of 2016.  Referring to the transcript, that's 350T-1.  He has a discussion with Thompson on the phone, Raidy Thompson. During that discussion, Thompson explains that she's having trouble depositing the money with the banks.  Nobody is really comfortable with this anymore.  The banks are asking too many questions.  Raidy was nervous about it.

And what does Mr. Marley say?  He says he's been telling Mex this.  He's been telling Poppa:  No one wants to go to the banks anymore.  Nobody wants to do this. So clearly what you know from this conversation is that Poppa, who is the supplier, is asking for his money and he's not getting it.  And everybody knows that when your supplier isn't getting their money it's the -- the supply dries up.  That's it. And you know that by February 10 this discussion takes place.  I told Poppa:  People aren't going to the banks.  Raidy is concerned.  She can't deposit money in the banks.  And by February 16 there's two boxes received.  And what does Griffith tell you?  February 2016 is when I stopped working with Marley. Why?  Why?  Why does he suddenly stop working? Because the money dried up.  The supply is drying up.  Poppa is not delivering the boxes through him anymore. There is no supply being shipped in.  The evidence in this case, as it's presented to you, as you have right now, Poppa is not delivering these shipments through Griffith any longer. Griffith isn't getting money.  So that's it.  The business relationship is over.  He wasn't threatened. He wasn't a victim in all of this.  No money, no honey.  That's it.

So the evidence actually shows that this relationship with Mex, Poppa, is short-lived, very short-lived.  Starts off.  Let's get this new year started off January 2016.  By February, by sometime around mid-February, it's done.  I assert to you that's what we've got here.  The relationship is over.

So what happens after that?  That's when it appears Marley and Mohammed have the issue with the car chase and the box being thrown out the window.  So the government has played to you transcript G 305T-1 which discusses this ongoing – this chase -- this discarding of the drugs.  And this all occurs on February 16 of 2016, six days after Mr. Marley says on the phone:  I told Poppa we can't get money in the banks.  Nobody wants to go to the banks.  I've been telling him I have this problem.

So what happens?  He has to find a new supplier, a new supplier out of Philadelphia.

So the government comes here and they tell you well he's got multiple sources coming in.  He's got Poppa.  He's got Philly.  No.  I assert to you on the evidence you have before you, he had Poppa, and now he's got Philly, because Poppa fell through.  So he's got to keep something more local where the money could be transferred locally where it could be hand delivered and the marijuana could be received. So it's not like he's got all of this coming in from all different sources and that one week was just what came in from Griffith.  No.  That came in from Griffith.  Things fell through with Griffith and Poppa.  And then you have an effort at finding a new supplier in Philly.  And that goes terribly wrong with the car chase and the drugs being thrown out the window. And then Mr. Marley has further problems.

The government played you that audio where he gets into the argument over the three thousand dollars because Nose took three thousand dollars.  And, of course, they relied on a lot of that conversation to show the potential threat of the gun, which I'll get to in a few moments.  But Marley is having problems not just with Mex, the supply chain, not just with Philly losing a box. He's also having problems with the street level dealers.  Nose takes three thousand dollars.  He's angry about it.  Yeah.  It shows that he's angry.  He wants his three thousand dollars.  But there may be a reason for that, right.

This is a January 5 phonecall where he's like:  I you want my three thousand dollars. Where's my three thousand dollars?  It was January 12 that Mex was coming into town and he had to pay him because otherwise the supply chain was going to slow down. So, yeah, the evidence shows that he wanted that money so that he can continue it.  But what the evidence also shows is that if you're demanding three thousand dollars that vigorously you are not a big time drug dealer. You're just not.  That is pennies.  That is nothing.  You're going to get angry over three thousand dollars and flip out on the phone?  You're a nobody.  You're a startup.  So, the numbers that you're being given and the math is all wrong.  It's just wrong.

Ms. Heron told you that when people come by the apartment, like Oliver, they come and they weigh out a pound or two here and there and then they leave.  Those are small street level amounts.  They're not coming in and grabbing tons of weight and walking out the door.  They're grabbing a little bit of weed and leaving.  The street level dealers in this conspiracy, this alleged conspiracy, they're not pushing weight.  There's nothing significant about this. There was an effort, a connecting with Poppa and bringing in weight.  That may be.  You may find that.  But it never materialized because he had problems, and by mid-February nothing was going on.  And then he had problems with Philly. And then he's got problems with the street level dealers who are robbing him blind and other people who are coming in and all they can push out the door is a pound or two here and there when they come to the apartment.

So what about the government's discussion or their reference to Mr. Marley meeting up with Griffith at one point in January and talk about bringing crates in?  Well that shows that he's a big time drug dealer, no?  No, it does not.  It shows he's hopeful.  He's hopeful to maybe go somewhere with this, but it doesn't go anywhere. That discussion, which is transcript 370T-1, occurs on January 10, 2016 just before Mex comes into town on January 12 of 2016 for the fish

and the money. This was an effort, at best, for Mr. Marley to say, Look, I got this great supplier we're going to keep things flowing, maybe we could get crates of this stuff coming in, maybe we could all be wealthy.  But it never panned out. Nothing ever happened like that.  It just didn't.

So Griffith may say no I wasn't comfortable with that, it's not going to work out because I'm afraid of getting caught, this and that.  I don't know if there's any truth to that statement at all. I don't know what the procedures would be at the shipping company.  But the question may have been asked, it may not have happened, but the question may have been asked because of Mex, the new supplier as of January 2016. That's the only time this major weight comes in.  And it's not even all that major.  But when we're talking about a hundred kilos what comes in is 110 pounds of boxes to Griffith.  And that's what we're talking about from there.  And we don't even know the total weight of the actual marijuana.  I don't know what's inside those boxes.  Maybe half that.

So, the interesting thing is that when you total up the police -- the police recovered about a hundred pounds of marijuana from Heron's apartment when they do their sweep of the apartment. And I assert to you, ladies and gentlemen, it's very possible that's it.  That was what came in from Griffith. And it's still sitting there.  Just like I said, the street level distributors can't move it.  It's sitting there in the apartment.  A hundred pounds is about 40 something kilos, between 40 and 50-kilos.  And then you have all the others totaling up 65-kilos. So the question that the government is asking you to do, what the government is asking you to do is fill in the blanks.  Fill it in.  Make up a number.  Add in another 35-kilos.  Why not?  He's not some big time drug dealer that the government is making him out to be.  He's just not."

**C.  <u>Firearm Violation.</u>**

Mr. Marley was convicted of Count Two of the indictment, charging him with Using and Carrying Firearms During and in Relation to a Drug Trafficking Crime in violation of 18 USC § 924(c)(1)(A)(i) and (2).   Although Mr. Marley was convicted of using and carrying firearms, the proof and evidence at trial clearly established that the guns were used for personal protection against possible robberies.

Mr. Marley has reason to fear being shot during a robbery.  As addressed in the PSR, in 2003 or 2004, he and a friend were both shot in Brooklyn during a marijuana transaction.  Mr. Marley was shot in the right upper arm, left foot, and abdomen; he has an exit wound on his lower back.  He was hospitalized for approximately three weeks, including five days in intensive care at Kings County Hospital Center.  (PSR ¶ 91).  Additionally, in 2000 or 2001, Mr. Marley was shot in the left forearm while being robbed of his motorcycle.  (PSR ¶ 92).

Although Mr. Marley has been shot numerous times, there was no proof at trial that Mr. Marley had used any gun in an act of violence against another person.

Regarding Mr. Marley's gun possession, Radianna Thompson testified that he carried the gun for protection against possible robberies.  She testified as follows (Tr. P. 102-103):

> Q.  What would happen if someone would come to the apartment asking for marijuana?
>
> A.  If it's a friend, a close friend, he won't take a gun with him, but if it's like a regular custy, he will bring it.
>
> Q.  By "custy," what do you mean?
>
> A.  People that buy weed from him.
>
> Q.  Custy is short for?
>
> A.  Customer.

Q. Customer.  Thank you. Did you have an understanding as
to why he would bring a gun to meet with a customer?

A. Yeah.  For protection.  He don't want to get robbed.

Elain Heron testified that she saw Mr. Marley carrying a gun and that he would

sometimes take the gun on out-of-state trips.  However, she also did not testify that she ever saw

Mr. Marley use a gun against another person.  Ms. Heron testified as follows (Tr. P. 236-238):

Q. Have you ever seen the defendant carrying a gun?

A. Yes.

Q. How often did you see him carrying a gun?

A. Just a little gun.  He always walks with a little thing.

Q. By "little thing," you mean a gun?

A. Yes.

Q. Where would the defendant carry the gun?

A. Sometimes in his waist or in his bag.

THE COURT:  His waist or his bag?

THE WITNESS:  His waist or his bag.

Q. Would the defendant ever store a gun in your apartment?

A. No.

Q. Did the defendant ever travel out of New York for his
marijuana business?

A. Go to like California, sometimes Florida, Poughkeepsie,
Philadelphia.  California, Poughkeepsie, Florida.

Q. California, Florida, Poughkeepsie, and Philadelphia?

A. Yes, Ohio.

Q. Would he travel by plane or by car?

A. I know by plane going to California and Florida, but the local one he would drive.

Q. How would you know the defendant went these places?

A. Because when I called him, he would tell me, because we were close like that.

Q. Would the defendant take a gun on the trips that he drove on?

MR. KONOSKI:  Objection.  No foundation.

THE COURT:  If you know.  Do you know whether he carried a gun on the trips?

A. Yes, he would travel with his gun.

Q. Why would he take the gun?
[*Questions and answers related to a sustained objection have been removed*]

Q. Did the defendant ever tell you why he took the gun?

A. Yes.  He wanted the gun because -

MR. KONOSKI:  Objection.

THE COURT:  Overruled.

A. Because (unintelligible) -

MR. KONOSKI:  Judge, I would object again.

THE COURT:  Overruled again.  When did he tell you this?

THE WITNESS:  No.  I know.

THE COURT:  You just know this?

THE WITNESS:  Yes, I know.

THE COURT:  He is focusing on what Mr. Marley told you or what you saw on your own.

THE WITNESS:  I would see him with a gun.

THE COURT:  You would see him leave the house to go
travel with a gun?

THE WITNESS:  Yes, I would see him with a gun.  He has
to walk with his gun.

Gerard Griffith testified that he believed Mr. Marley had threatened him.  However, despite allegedly feeling threatened by Mr. Marley, he confirmed that Mr. Marley never threatened him with a gun.  Mr. Griffith testified as follows (Tr. P. 366):

Q. Mr. Marley didn't pull a gun on you?

A. No, sir.

Q. In fact, he never pulled a gun on you?

A. No, sir, never, correct.

Q. Never showed you a gun?

A. No, sir.

## D. <u>Obstruction of Justice.</u>

Pursuant to USSG § 3C1.1 application note 4, committing, suborning, or attempting to suborn perjury is an example of obstructing or impeding the administration of justice.  The PSR states that, "in an Opinion and Order dated October 31, 2017, the Honorable Valerie E. Caproni stated multiple times that the Court did "not credit" certain of Marley's testimony during a suppression hearing on July 20 and 21, 2017, or that the Court found his testimony "not credible".  For this reason, Probation added a two-point adjustment for Obstruction of Justice in the guideline calculation. (PSR ¶ 24).

In reviewing the Opinion and Order dated October 31, 2017, there were four places where the court addressed Mr. Marley's credibility.  Those instances are as follows:

- **<u>Page 12:</u>**

<u>Marley's testimony that Luna's call never occurred is not credible</u> and is contradicted by considerable evidence in the record.  <u>Both Enders and Luna credibly testified that the call occurred</u>; Marley testified that the 4484 phone was his, that he possessed it on the day of the call, that he was the only person who used that phone, and that he did not authorize anyone else to answer any of his calls.  Although he initially denied ever speaking Spanish on the telephone, Marley ultimately admitted that, at times, he spoke Spanish on the phone and used codes during such calls, which aligns with Luna's version of the conversation.  Luna testified that the other party to the call had a Jamaican accent, and Marley has such an accent.

In addition, the telephone records confirm that the 4484 phone received an incoming call at the time Enders testified the undercover call was placed.  Luna testified that the other party said he was unable to meet because he was in Cleveland, and GPS data indicated that the 4484 phone was in Cleveland the following day.  The Court is thus satisfied that the undercover call occurred and that its content was as testified to by Luna.

- **<u>Page 16:</u>**

At the suppression hearing, there was a sharp conflict between Marley's testimony and Currao's regarding the circumstances surrounding the car stop.  Marley testified that, although he was not driving, he was sure that the driver had made no lane changes without signaling.  Tr. at 169.  <u>The Court does not credit Marley's testimony regarding how the car was being driven</u>.  Marley admitted that he was not driving and was on the phone at the time of the stop, making him an unreliable historian regarding whether all lane changes were properly preceded by a signal.

- **Page 19**

The agents testified that, during the traffic stop, Marley identified himself as the owner of the car and consented to a search of the vehicle for weapons. See Tr. at 17–18; 20; 62; 107; 113. Based on Marley's self-identification as the owner, Currao reasonably believed that Marley had actual or apparent authority to consent.   Currao relayed Marley's consent to his supervisor, DiCarlo, and it was on the basis of this consent that Enders and DiCarlo subsequently searched the vehicle.   <u>While Marley denies that he consented, his testimony on that point was not credible, whereas Currao's was.</u>   Therefore, the search of the vehicle was proper because Marley consented, and the Court does not reach the question of whether other conditions, such as the odor of marijuana in the car, provided probable cause to search.

- **Page 24**

As to Powell's phone, Enders testified credibly that DEA learned of Powell through the Stern wiretap, which captured calls between Powell and Stern discussing money drop arrangements for Marley and others.   Those calls led the Jamaican authorities to wiretap Powell's phone, which, in turn, identified Powell as its owner.   <u>The Court does not credit Marley's unsupported speculation that Powell's contact information was unlawfully extracted from his phones on the evening of his arrest.</u>

### III.

### THE DEFENDANT'S SENTENCING GUIDELINE CALCULATION

Defendant, Jason Marley, will be sentenced upon his convictions for Conspiracy to Distribute and Possess with Intent to Distribute Marijuana, Cocaine, Cocaine Base, and Heroin, in violation of 21 USC § 846 and 841(b)(1)(B)) and Using and Carrying Firearms During and in Relation to a Drug Trafficking Crime in violation of 18 USC § 924(c)(1)(A)(i) and (2).

The Probation Office has determined that Mr. Marley's total offense level is 29, and that his Criminal History Category was VI. Thus, according to the Probation Office, Mr. Marley is facing a Guidelines sentence range of 151 to 188 months imprisonment, with a mandatory minimum sentence of 5-years' imprisonment on Count One, followed by another 5-year mandatory minimum sentence on Count Two. The total mandatory minimum sentence applicable to Mr. Marley between both Counts One and Two, is 10-years' imprisonment.

The PSR calculates Mr. Marley's Offense Level as follows (PSR page 6-7):

Base Offense Level:                       24

      Drug weight found:

      Marijuana        325.0 kg

      Cocaine          103.3 gm

      Cocaine Base  3.5 gm

      *The total "marijuana equivalency" is 358.16 kg

Role Adjustment (manager/supervisor):      +3

Obstruction of Justice:                    +2

Acceptance of Responsibility:              +0

Total Offense Level                        29

The Defense is not in agreement with the Offense Level calculation reached by the Probation Office.  Specifically, the Defense does not agree with, and objects to, an Adjustment for Obstruction of Justice.  By removing this two-point enhancement, Mr. Marley's Total Offense Level would be reduced to 27.  Thus, Mr. Marley's Guideline sentence range would be 130-162 months' imprisonment. Moreover, the Defense is not in agreement with, and objects to, a finding that the Marijuana that was the subject of the conspiracy totaled at least 325.0 kilograms.[1]  See Discussion below under Section V.

The Defense also argues below that Mr. Marley's Criminal History Category overstates the severity of his past criminal conduct.  Specifically, Mr. Marley's convictions for low level marijuana convictions result in two points being added to his criminal history calculation.  By removing these two points, Mr. Marley's CHC would be reduced to Level V.  With a Total Offense Level of 27, and a CHC Level V, Mr. Marley would be facing a Guideline Sentence Range of 120-150 months' imprisonment.  See Discussion below under Section VII.

On behalf of the defendant, I offer this sentencing memorandum to assist the Court in arriving at a sentence "sufficient but not greater than necessary" to satisfy the goals of sentencing as codified at 18 U.S.C. § 3553(a)(2).

Based on all of the factors discussed within this memorandum, it is respectfully requested that the court sentence Mr. Marley to a sentence of <u>10-years' imprisonment</u>, which is the mandatory minimum sentence required in this case.

---

[1] The Defense recognizes that because the total amount of the Marijuana is less than 400 kilograms, a finding that the total weight is 325 kilograms has no impact on the sentencing guideline range. However, the Defense still objects to this finding.  It is the defense position that the amount of marijuana proven at trial was greater than 100 kilograms (as determined by the Jury) but was substantially less than 325 kilograms.

**IV.**

**A SENTENCE OF 10-YEARS' INCARCERATION (THE MANDATORY MINIMUM) IS APPROPRIATE DUE TO THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT. (18 U.S.C. § 3553(a)(l)).**

Congress has directed sentencing courts to consider "the history and characteristics" of the defendant when imposing sentence.  18 U.S.C. § 3553(a)(l).

There is certainly no doubt that when someone commits a crime in our society, there are repercussions.  Nothing in this memorandum to the court should be interpreted as undermining the seriousness of the offenses that Mr. Marley has been convicted of.  However, based on my communications with Mr. Marley, my review of the discovery in this case, and the content of the PSR, I believe that leniency by this Honorable Court is justified in this case. Specifically, I am asking this Honorable Court to sentence Mr. Marley to the minimum sentence allowable by law, which is 10-years' incarceration (the mandatory minimum).

**(1) Mr. Marley has no significant family ties.**

Mr. Marley appears to have no significant family ties of any kind.  He is, essentially, alone in this world.  And, it appears that he "bought" his friendships and relationships with whatever money he was able to earn selling Marijuana.

Mr. Marley related that he is the only child born of Carmen Johnson and Patrick Marley. He has seven maternal half-siblings and four paternal half-siblings.  However, he is not in contact with any of them.  Moreover, he has not spoken to his mother in 10-12 years, and has not spoken to his father in at least 10 years as well.  (PSR ¶ 76).  He does not know if his parents are living or deceased.

Although Mr. Marley was very guarded during the probation interview, and he did not reveal much information about his background and history, we did learn a few things.  Based on

the statements provided by Mr. Marley, some family turmoil can be inferred. First, he has absolutely no contact with any siblings, or his mother and father. (PSR ¶ 76). This fact alone sends a clear message that it is likely Mr. Marley grew up in a very dysfunctional home. It is simply not normal for a child to grow up and have absolutely no contact whatsoever with his parents for over a decade. Second, his family was poor and there were times when they did not have sufficient food or clothing. (PSR ¶ 78). The fact that Mr. Marley grew up very poor also likely contributed to a dysfunctional upbringing. However, it is also a likely contributing factor as to why Mr. Marley now stands convicted of selling Marijuana to earn money. Third, it appears that his father and mother had a dysfunctional relationship. Apparently, his mother was an exotic dancer, which is something that his father was dissatisfied with. (PSR ¶ 77). Moreover, it is also possible that his parents had substance abuse problems. Both of his parents smoked Marijuana and his father drank rum. (PSR ¶ 79). This raises some suspicion that Mr. Marley's parents were substance abusers and that there may have been domestic violence issues during Mr. Marley's childhood.

Mr. Marley reports that he has eight children born to five women. (PSR ¶ 81). He claims that he had been in contact with his three youngest children, but that ceased when he started trial in this case. (PSR ¶ 82). He reports that he does not have any communication with two of his older children because they are "grown" and they no longer listen to him. (PSR ¶ 82). Once again, the information provided by Mr. Marley demonstrates that his family contacts are tenuous at best.

Radianna Thompson and Appalonia Phipps are the mothers to Mr. Marley's three youngest children. Mr. Marley claims that he paid Ms. Thompson's rent and gave Ms. Phipps between $500 and $700 per month. He also said he provided his three youngest children with food, clothes, and school supplies. (PSR ¶ 82). However, Radianna Thompson was a cooperating witness at trial

and testified against Mr. Marley.   Once again, this also shows the very tenuous personal relationships that Mr. Marley has with everyone in his life.

Mr. Marley also spent about eight years living with Elaine Heron. (PSR ¶ 15). Mr. Marley saw her as a "mother figure". She was arrested in this case and was a cooperating witness against Mr. Marley. She testified at trial and did so in a manner that appeared easy and almost care-free. She did not seem to have any problem whatsoever with testifying against Mr. Marley. This, too, demonstrated that even people that were close to Mr. Marley, and were almost like a "mother" to him, did not have a strong bond with him.

The PSR states that Mr. Marley's PSR from the Western District of Pennsylvania has conflicting information. (PSR ¶ 81 and 83). The conflicting information appears to be related to the number of siblings Mr. Marley has, his father's job, and the names of his children and their mothers. (PSR ¶ 81 and 83). While it appears there is some conflicting information between the two PSR's, the conflicts relate to Mr. Marley's family relationships. If anything, these conflicting statements appear to demonstrate that Mr. Marley is guarded about his family. The most logical explanation for the conflicting information is that he lacks any meaningful relationship with anyone.

Mr. Marley is alone in this world. The only people that spent time with him did so for the benefits they received. Radianna Thompson lived with Mr. Marley and received money for her apartment and living expenses. Likewise, Ms. Heron also received money from Mr. Marley from time to time. Ms. Phipps also received cash assistance from Mr. Marley. Mr. Marley has no deep or meaningful relationships in his life. If not for the fact that he made some money from his Marijuana business, it is certainly possible his relationships would have been even more fleeting. It appears that his immediate family, such as his parents and siblings, have not been in contact with

him for many years.  The only relationships Mr. Marley had in his life now are those that he was able to "buy" with cash payments.

It is a tragedy that the sum total of all of Mr. Marley's relationships is essentially zero. And it is a further tragedy that the only reason why Mr. Marley had anyone in his life that he thought of as family – such as Ms. Heron who he viewed as a "mother figure" – was because of the money he earned through his illegal Marijuana business (a business that, arguably, was not very successful).

### (2) Mr. Marley has a substance abuse problem.

Mr. Marley consumed alcohol daily from 2007 until his arrest.  He drank Hennessy, Guiness, or Magnum daily, except for the time period he was on parole.  Although Mr. Marley claims he did not drink to the point of intoxication, he did state that he drank throughout the day. (PSR ¶ 95).

Mr. Marley also smoked marijuana daily, "twenty-four hours a day", from the age of 15 until he was arrested. (PSR ¶ 96).  He also stated that he used cocaine, but that he only used it once at the age of 18.  (PSR ¶ 97).

Ms. Marley has been in substance abuse treatment in the past (PSR ¶ 98), and is amenable to future treatment.  The fact that Mr. Marley has been amenable to past treatment, and is amenable to future drug treatment as well, warrants a downward variance.  *See United States v. Nastri*, 633 F.App'x 57, 59 (2d Cir. 2016)("[I]t is well within a district court's discretion to determine whether addiction is the cause for leniency or merely an indication that he will 'persist [ ] in a life of reckless, criminal, dangerous, destructive, [and] deceitful conduct.'")(*quoting United States v. Douglas*, 713 F.3d 694, 703 (2d Cir. 2013); *see also*, *United States v. Walker*, No. 2:13-CR-379, 2017 WL 2198194, at *16 (D. Utah May 18, 2017)("While [t]he initial decision to take drugs is

mostly voluntary . . . when drug abuse takes over, a person's ability to exert self-control can become seriously impaired.  . . . Stated plainly, addiction biologically robs drug abusers of their judgment, causing them to act impulsively and ignore the future consequences of their actions; *United States v. Hendrickson*, 25 F.Supp.3d 1166, 1172-73 (N.D. Iowa 2014)("By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors.  Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively without accurately weighing future consequences.  This is certainly true for Hendrickson, whose criminal history coincides with, and directly relates to, periods of drug abuse"); *but see* U.S.S.G. § 5H1.4 ("Drug . . . dependence or abuse ordinarily is not a reason for a downward departure.  Substance abuse is highly correlated to an increase in propensity to commit crime.").

It is hard to fathom how Mr. Marley has not been "hijacked" by his dependence on substances.  He admitted smoking Marijuana daily, and 24-hours a day.  Moreover, he drank alcohol with a high alcohol content on a daily basis for many years.  Enrollment in a proper drug treatment program with the goal of remaining clean and sober would be a factor for the court to consider in granting a variance in this case.

### (3) **Mr. Marley has no disciplinary history while in custody.**

A defendant's post-incarceration conduct should be heavily weighed in assessing deterrence, protection of the public, and rehabilitation under 18 USC § 3553(a)(2)(B)-(D).  *See Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011) *quoting United States v. McMannus*, 496 F.2d 846, 853 (8th Cir. 2007).  Mr. Marley's post-arrest conduct demonstrates that he does not require incarceration beyond the required mandatory minimum in order to properly rehabilitate and refrain from future criminal conduct.  Mr. Marley has not received any infractions while

incarcerated.  Moreover, he took two courses in entrepreneurship while in custody at MDC in Brooklyn. (PSR ¶ 6).  Based on the good behavior that he has exhibited while incarcerated, it can be concluded that a sentence of <u>10-years' incarceration</u> will continue to provide adequate deterrence to Mr. Marley to avoid further criminal conduct.

**V.**

<u>**A SENTENCE OF 10-YEARS' IMPRISONMENT (THE MANDATORY MINIMUM) IS APPROPRIATE DUE TO THE NATURE AND CIRCUMSTANCES OF THE OFFENSE. (18 U.S.C. § 3553(a)(l).**</u>

Amongst the most important sentencing factors for a court to consider are the "nature and circumstances of the offense."  18 U.S.C. § 3553(a)(l).  As an initial matter, it is important to note that the defendant is not downplaying the seriousness of the offense of conviction in this case. However, the underlying offense conduct warrants a sentence of not more than <u>10-years' imprisonment</u> (the mandatory minimum).

From approximately February 2016 through April 2016, Jason Marley was the manager and supervisor of a drug trafficking conspiracy, which mainly focused on the distribution of marijuana but also involved the distribution of cocaine, cocaine base (crack), and heroin.  (PSR ¶ 12).

Mr. Marley received large quantities of marijuana on a nearly weekly basis from his suppliers on the west coast.  He would store the marijuana in at least two locations:  the apartment in Brooklyn where two of his children and their mother, Radianna Thompson, lived; and the Brooklyn apartment of Elaine Heron, who was a mother figure to Mr. Marley.  In addition to storing marijuana for Mr. Marley, Ms. Thompson brought drugs to dealers and collected money from them, and Ms. Heron reported to Mr. Marley when runners came by to pick up drugs.  Nearly every week, Mr. Marley and his associates would bring large boxes filled with marijuana to Ms.

Thompson's and Ms. Heron's apartments, weigh the marijuana, and stor it in quantities of half a pound to two pounds.  Denille Jameson was also alleged to have assisted Mr. Marley by stashing drugs and drug trafficking tools at her residence in Brooklyn. (PSR ¶ 15)

Depending on the quality of the marijuana, it sold for between $700 per pound to over $2,000 per pound.  (PSR ¶ 15).

Mr. Marley had the marijuana shipped to multiple locations in and around New York.  One witness at trial testified that several boxes would be sent to the freight forwarding business where the witness worked, which was located near John F. Kennedy Airport.  The witness testified that Mr. Marley had multiple boxes sent to the business on a weekly basis.  The witness also testified that when he told Marley he no longer wanted to be involved, Mr. Marley made comments about the witness's family and house, which he interpreted as a threat.  (PSR ¶ 16).

During the course of its investigation into Marley's activities, the Government wiretapped several of his cell phones.  The wiretaps revealed many conversations between and among Mr. Marley and his associates discussing the delivery and sale of narcotics.  Mr. Marley often discussed the narcotics using code words, such as "food" (marijuana), "Chinese food" (heroin), "Frank Lucas" (also heroin), "the whites" (cocaine), and "the hard" (crack cocaine).  In one sequence of wiretaps, Mr. Marley and his associates coordinated the picking up of narcotics that had been sent to Philadelphia.  Agents tried to pull over the associate, who threw the box of marijuana into a yard.  Agents recovered the box, which contained approximately 35 pounds of marijuana.  (PSR ¶ 17).

Mr. Marley possessed firearms in connection with his drug business.  When agents conducted searches of locations used by him, they recovered multiple firearms.  Two of the firearms – including one found in Ms. Williams' apartment in Queens – had Mr. Marley's DNA

on them.  Two witnesses testified at trial that Mr. Marley possessed the firearms, in part, for protection while he was dealing drugs.  For example, if Mr. Marley met with a customer he did not know, he carried a gun.  (PSR ¶ 18).

In addition to finding firearms, agents recovered over 75 pounds of marijuana, as well as 103.3 grams of cocaine, and 3.5 grams of crack.  Marley kept drugs, a gun, a loaded clip, and ammunition in a large blue shipping barrel in his children's bedroom in the apartment where they lived with Ms. Thompson.  (PSR ¶ 19)

Despite the fact that Mr. Marley was convicted after trial, it is clear that this case is primarily relates to Marijuana distribution – a substance that is legal in some other states and is likely to be legal in New York in the very near future.  Moreover, although Mr. Marley was convicted of gun possession, there was no evidence at trial that he used a gun to harm anyone.

It is also important to note that there is a significant dispute over the amount of Marijuana that was the subject of the conspiracy.  The Government alleges that Mr. Marley was responsible for receiving and distributing as much as 325 kilograms of Marijuana.  (See PSR and Closing arguments).  The Defense claims that although the weight of the Marijuana exceeded 100 kilograms (as determined by the Jury), there is insufficient proof to determine what the actual weight was, and that the true weight was significantly lower than 325 kilograms.

For these reasons, in addition to the other reasons set forth herein, the defense is asking for the Court to sentence Mr. Marley to 10-years' incarceration (the mandatory minimum).

## VI.

## A SENTENCE OF 10-YEARS' INCARCERATION (THE MANDATORY MINIMUM) IS APPROPRIATE (18 U.S.C. § 3553(a)(2)).

In this case, the Court must also consider the need for the sentence imposed. 18 U.S.C. § 3553(a)(2). Based on the totality of the circumstances present in this case, coupled with an analysis of each of the pertinent factors set forth in 18 U.S.C. § 3553(a)(2), which are discussed below, the Court should consider that justice is served with a sentence of 10-years' incarceration.

### (1) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

In this case, a sentence of 10-Months' incarceration is sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

As discussed above, Mr. Marley's crimes were non-violent and there is no indication that any person was harmed. While the defendant is not intending to undermine the severity of the crimes he admitted to committing, the fact that these crimes were non-violent demonstrates that a lesser sentence is appropriate.

### (2) To afford adequate deterrence to criminal conduct.

In this case, a sentence of 10-years' incarceration would afford adequate deterrence to criminal conduct.

Additionally, a defendant's post-incarceration conduct should be heavily weighed in assessing deterrence, protection of the public, and rehabilitation under 18 USC § 3553(a)(2)(B)-(D). *See Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011) *quoting United States v. McMannus*, 496 F.2d 846, 853 (8th Cir. 2007). As discussed under Section IV(3), above, Mr. Marley has no disciplinary history while in custody. Moreover, he took two courses in

entrepreneurship while in custody at MDC in Brooklyn.  (PSR ¶ 6).  This demonstrates that his incarceration will afford adequate deterrence to future criminal conduct.

### (3) <u>To protect the public from further crimes of the defendant.</u>

For all the same reasons discussed above, a sentence of <u>10-years' incarceration</u> would be sufficient to protect the public from further crimes of the defendant and will provide sufficient deterrence from further crimes.

### VII.

### <u>OBSTRUCTION OF JUSTICE POINTS SHOULD NOT BE INCLUDED IN THE SENTENCING CALCULATION.</u>

Pursuant to USSG § 3C1.1 application note 4, committing, suborning, or attempting to suborn perjury is an example of obstructing or impeding the administration of justice.  The PSR states that, "in an Opinion and Order dated October 31, 2017, the Honorable Valerie E. Caproni stated multiple times that the Court did "not credit" certain of Marley's testimony during a suppression hearing on July 20 and 21, 2017, or that the Court found his testimony "not credible".  For this reason, Probation added a two-point adjustment for Obstruction of Justice in the guideline calculation.  However, the Obstruction of Justice enhancement is improper in this case.  For the reasons set forth below, the Court should not apply the two-point enhancement for Obstruction of Justice.

In order for the court to properly reach the conclusion that Mr. Marley's statements in the state deposition *did* actually warrant imposition of the § 3C1.1 obstruction of justice enhancement, the court is required to make certain findings.  Application § 3C1.1 generally requires findings of willfulness and materiality. *See* U.S.S.G. § C1.1 comment. (n.3(d),(f)-(h)). *See also United States v. Zagari*, 111 F.3d 307 (1997). The willfulness requirement means that the enhancement "is appropriate only upon a finding that the defendant had the 'specific intent to obstruct justice, i.e.,

that the defendant consciously acted with the purpose of obstructing justice.'" *United States v. Defeo,* 36 F.3d 272, 276 (2d Cir. 1994) (citation omitted); *see also United States v. Reed, 49 F.3d 895, 900 (2d Cir. 1995)* ("The term 'willfully' implies a *mens rea* requirement."), *aff'd after remand*, 88 F.3d 174 (2d Cir. 1996).

An enhancement for obstruction of justice may therefore be granted if the court finds that the defendant willfully and materially impeded the search for justice in the instant offense. Such obstruction can be accomplished in many ways, one of which is the giving of perjured testimony. If a court chooses to rely upon allegedly perjured testimony as a basis for application of the enhancement, however, it must make specific findings which indicate that the judge has considered all of the elements of perjury, including materiality, and has found that they have all been met. *United States v. Dunnigan,* 507 U.S. 87, 92-95, 113 S. Ct. 1111, 1115-17, 122 L. Ed. 2d 445 (1993) required that, before applying this enhancement on the basis of apparent perjury, a sentencing court must explicitly find that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory" -- i.e., that the defendant committed perjury rather than simply providing false testimony. *Id.* at 94. *Dunnigan* went on to hold that this requirement could be met if the court makes a finding of obstruction of justice which encompasses all of the factual predicates for perjury, though noting that distinct findings on each element of the alleged perjury were preferable. A finding of perjury must include findings that the witness gave false testimony concerning a material matter with the willful intent to provide false testimony. *See United States v. Catano-Alzate*, 62 F.3d 41, 43 (2d Cir. 1995) (per curiam); *see also, United States v. Williams,* 79 F.3d 334, 337-38 (2d Cir. 1996) (sentencing court must make finding of willful perjury even if defendant's testimony was so

inherently untruthful that factual predicates to perjury were obvious); *United States v. Cox*, 985 F.2d 427, 432-33 (8th Cir. 1993).

Our law to date, therefore, provides that in order to base a § 3C1.1 enhancement upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter. *United States v. Zagari*, 111 F.3d 307 (1997).

In this case, this Court should not find that the elements of perjury have been met. Although the Court found that Mr. Marley's testimony was not credible at certain points during the pre-trial hearings, his testimony was not willfully or intentionally false.  There were four (4) places where the Court addressed Mr. Marley's credibility in the Court's Decision and Order dated October 31, 2017.  I will address each, in turn, below.

- **Page 12:**

The Court's Decision and Order states:

"Marley's testimony that Luna's call never occurred is not credible and is contradicted by considerable evidence in the record.  Both Enders and Luna credibly testified that the call occurred; Marley testified that the 4484 phone was his, that he possessed it on the day of the call, that he was the only person who used that phone, and that he did not authorize anyone else to answer any of his calls.  Although he initially denied ever speaking Spanish on the telephone, Marley ultimately admitted that, at times, he spoke Spanish on the phone and used codes during such calls, which aligns with Luna's version of the conversation.  Luna testified that the other party to the call had a Jamaican accent, and Marley has such an accent.

In addition, the telephone records confirm that the 4484 phone received an incoming call

at the time Enders testified the undercover call was placed.  Luna testified that the other party said

he was unable to meet because he was in Cleveland, and GPS data indicated that the 4484 phone

was in Cleveland the following day.  The Court is thus satisfied that the undercover call occurred

and that its content was as testified to by Luna."

The Court's Decision and Order does not find that Mr. Marley's testimony was willfully

or intentionally false.  First, it is important to note that this phone call was not recorded, whereas

all of the other pertinent calls were recorded.  Second, the fact that Mr. Marley testified that the

call did not occur does not mean he intentionally lied to the Court.  The call that was placed by

law enforcement was placed a lengthy period of time before Mr. Marley was arrested and many

months before motions were submitted and hearings conducted.  As set forth in the PSR, Mr.

Marley smoked Marijuana on a daily basis, "twenty-four hours a day", from 2007 until he was

arrested in this case.  Thus, it is highly probable that Mr. Marley was using Marijuana and drinking

alcohol on the day this phone call was made.  It is unquestionable that Marijuana and alcohol usage

could impact someone's memory.  Even if the call occurred, Mr. Marley may not remember this

phone call.

There is insufficient proof that Mr. Marley willfully or intentionally gave perjured

testimony on this point.

- **Page 16:**

The Court's Decision and Order states:

"At the suppression hearing, there was a sharp conflict between Marley's testimony and

Currao's regarding the circumstances surrounding the car stop.  Marley testified that, although he

was not driving, he was sure that the driver had made no lane changes without signaling.  Tr. at

169.  The Court does not credit Marley's testimony regarding how the car was being driven.

Marley admitted that he was not driving and was on the phone at the time of the stop, making him an unreliable historian regarding whether all lane changes were properly preceded by a signal."

On this point, the Court specifically found that Mr. Marley was not credible because he was simply an "unreliable historian" because he was distracted by using the phone at the time of the stop.  Here, the Court's finding is inconsistent with a finding of perjury.  For this reason, there is insufficient proof that Mr. Marley willfully or intentionally gave perjured testimony.

- **Page 19**

The Court's Decision and Order states:

"The agents testified that, during the traffic stop, Marley identified himself as the owner of the car and consented to a search of the vehicle for weapons. See Tr. at 17–18; 20; 62; 107; 113. Based on Marley's self-identification as the owner, Currao reasonably believed that Marley had actual or apparent authority to consent.  Currao relayed Marley's consent to his supervisor, DiCarlo, and it was on the basis of this consent that Enders and DiCarlo subsequently searched the vehicle.  While Marley denies that he consented, his testimony on that point was not credible, whereas Currao's was.  Therefore, the search of the vehicle was proper because Marley consented, and the Court does not reach the question of whether other conditions, such as the odor of marijuana in the car, provided probable cause to search."

Similar to the point raised on Page 12, above, Mr. Marley was using Marijuana and alcohol regularly during this time period.  Mr. Marley may simply not remember clearly what transpired. Or, he may have believed that he did not give consent.  In either case, the fact that Mr. Marley was not found credible does not mean that he willfully or intentionally lied.

Additionally, this issue was not material to the case or the hearing.  Mr. Marley was not the true registered owner of the vehicle and, therefore, his consent to search was not required.

Thus, even if Mr. Marley's testimony was intentionally false, it would have had no impact to the outcome of the hearing on this point.  Because Mr. Marley was not the true registered owner of the vehicle, his consent was not required to perform the vehicle search.  Moreover, Agents testified that the Odor of Marijuana was emanating from the car.  Although the Court chose not to reach the question of whether the odor of Marijuana provided probable cause to search the vehicle, if the Court reached that issue there would likely have still been a finding that Agents permissibly searched the vehicle.  Thus, Mr. Marley's testimony on this issue was immaterial to the ultimate determination that Agents were lawfully permitted to search the car.

For the foregoing reasons, the Court should not find that Mr. Marley is subject to an enhancement for Obstruction of Justice on this point.

- **Page 24**

The Court's Decision and Order states:

"As to Powell's phone, Enders testified credibly that DEA learned of Powell through the Stern wiretap, which captured calls between Powell and Stern discussing money drop arrangements for Marley and others.  Those calls led the Jamaican authorities to wiretap Powell's phone, which, in turn, identified Powell as its owner.  The Court does not credit Marley's unsupported speculation that Powell's contact information was unlawfully extracted from his phones on the evening of his arrest."

Here, the Court has found that Mr. Marley was simply speculating.  For that reason, the Court cannot find that Mr. Marley's testimony was material or willfully or intentionally false.  The Court should not find that Mr. Marley is subject to an enhancement for Obstruction of Justice on this point.

## VIII.

## <u>A VARIANCE IS WARRANTED BECAUSE THE DEFENDANT'S CRIMINAL HISTORY SCORE OVERSTATES THE SEVERITY OF HIS PAST CRIMINAL CONDUCT.</u>

The law holds that "if reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range." *United States v. Cusack*, 66 F. Supp. 2d 493.

In this case, Mr. Marley's criminal convictions for Marijuana Possession were not particularly serious. Yet, the application of these relatively minor misdemeanor convictions have resulted in a Criminal History Category VI. His convictions, which resulted in points added to the CHC computation, are as follows:

1. Criminal Possession of Marijuana in the 5th Degree, a Class B Misdemeanor (8/19/2009)(1 criminal history point)

2. Criminal Possession of Marijuana in the 4th Degree, a Class A Misdemeanor, (11/07/2014)(1 criminal history point)

With these two convictions, Mr. Marley had 13 criminal history points, which gave him a Criminal History Category VI. However, if the Court did not consider these two convictions as part of the CHC calculation, Mr. Marley would have had 11 criminal history points. Assuming that the Court does not give Mr. Marley the Obstruction of Justice enhancement (see argument above), he would have a Total Offense Level of 27, with a CHC V, giving him a total Guideline range of 120-150 months imprisonment. It is respectfully requested that this Court grant a downward variance on the basis that the CHC overstates the seriousness of Mr. Marley's past criminal conduct.

## IX.

## <u>CONCLUSION</u>

As set forth in the discussion above, we request that Mr. Marley be sentenced to

<u>10-years' incarceration</u>, which is the mandatory minimum sentence required in this case.  In this

case, such a sentence is "sufficient, but not greater than necessary" to satisfy the purposes of

sentencing under§ 3553(a).

On behalf of Mr. Marley, I thank the Court for taking the time to consider our sentencing

submission. We look forward to addressing the Court during the sentencing hearing.

Dated:         New York, NY
               June 29, 2018

Yours, etc.,

*/s/ Bryan Konoski*

_____
BRYAN KONOSKI (BK7563)
Treyvus & Konoski, P.C.
*Attorney(s) for the Defendant*
305 Broadway, 14th Floor
New York, NY 10007
(212) 897+ -5832