I7UAAMARS                    Sentence

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4          v.                            16 CR 374 (VEC)

 5   JASON MARLEY,

 6              Defendant.

 7   ------------------------------x

 8                                        New York, N.Y.
                                          July 30, 2018
 9                                        2:00 p.m.

10
     Before:
11
                      HON. VALERIE E. CAPRONI,
12
                                          District Judge
13

14                          APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     TIMOTHY V. CAPOZZI
17   MICHAEL D. LONGYEAR
          Assistant United States Attorney
18
     BRYAN M. KONOSKI
19        Attorney for Defendant Marley

20

21

22

23

24

25
```

1           (Case called)

2           MR. LONGYEAR:  Good afternoon, your Honor.

3           Michael Longyear, on behalf of the United States.

4           MR. KONOSKI:  Good afternoon, judge.

5           appearing on behalf of Mr. Marley, Brian Konoski.

6           THE COURT:  Good afternoon.

7           Good afternoon, Mr. Konoski.

8           All right.  Mr. Marley, you wrote me last week and you

9    asked for a new attorney and for Mr. Konoski to be relieved.  I

10   think we have had this conversation before.  You can proceed

11   with Mr. Konoski as your lawyer or you can were proceed pro se

12   but I am not giving you another lawyer.  Mr. Konoski is your

13   second lawyer.  That's all you get.  So what do you want to do?

14           THE DEFENDANT:  Your Honor, you left me no choice

15   because you know I can't proceed by myself.  My first attorney,

16   your Honor, I made some misrepresentation to the Court on my

17   behalf, so you left me no choice.  He has left my family in a

18   financial crisis.  He took $63,000 from my family, your Honor.

19   We couldn't afford a next attorney.  So you appointed an

20   attorney that I feel it's like he doesn't have my best interest

21   but I have no choice.  I can't get a next attorney.  So I had

22   no choice.  I cannot go pro se by myself, so.

23           THE COURT:  OK.  Well, then Mr. Konoski is going to

24   represent you.

25           THE DEFENDANT:  OK.

1          THE COURT:  OK.  Mr. Konoski, have you read the

2     presentence report in this case?

3          MR. KONOSKI:  Yes.

4          THE COURT:  Have you discussed it with Mr. Marley?

5          MR. KONOSKI:  Yes.

6          THE COURT:  Mr. Marley, did you read the presentence

7     report in this case?

8          THE DEFENDANT:  What?  The presentencing report?

9          MR. KONOSKI:  Right.  The PSR.

10          THE DEFENDANT:  Yes, I have read it.

11          THE COURT:  Did you discuss it with your attorney?

12          THE DEFENDANT:  I never discussed it with him before

13     he sent in the objection.  I discussed it with him on Saturday.

14          THE COURT:  OK.

15          MR. KONOSKI:  Judge, there was a delay previously.  I

16     did go through it myself, determined what objections needed to

17     be made.  But this weekend, I had gone down to make sure that

18     Mr. Marley had no additional objections that I may not have

19     raised previously to make sure everything was on the table.

20     When I was there I had previously dropped off the PSR for

21     Mr. Marley.  He did review it.  When I went over it with him on

22     Saturday and ask him if he had any additional things he wanted

23     to address with me, he did not.  So there are no additional

24     objections at this time even after speaking with Mr. Marley

25     this weekend.

I7UAAMARS                    Sentence

1          THE COURT:  OK.  So were there any objections to the

2    report that the probation office didn't deal with.

3          MR. KONOSKI:  The only objections that we had, I

4    addressed in the sentencing memorandum which were --

5          THE COURT:  The amount of the drugs.

6          MR. KONOSKI:  The amount of drugs and the two point

7    enhancement for obstruction of justice.

8          THE COURT:  We'll talk about those when we get to the

9    guidelines calculation.  The presentence report will be made

10   part of the record in this matter and placed under seal.  If an

11   appeal is taken, counsel on appeal may have access to the

12   sealed report without further application to this Court.  I

13   received a sentencing submission from the defendants dated

14   June 29, 2018 and a letter from the government dated July 19,

15   2018.

16         So the next step is the guidelines calculation.  So

17   the defendant was convicted of one count of conspiracy to

18   possess and possess with intent to distribute marijuana and

19   other controlled substances, using and carrying a firearm in

20   connection with a controlled substance offense.

21         The presentence report reflects a guidelines level of

22   29, criminal history category six which yields a guidelines

23   range of 151 to 188 months, not counting the firearms

24   conviction which is a mandatory 60 months consecutive.

25         I find the correct guidelines calculation is as

I7UAAMARS                          Sentence

1    follows:

2           As to Count One we start with the drug guideline which

3    is 2D1.1.  The jury found that this offense involved more than

4    100 kilograms of marijuana and the Court agrees with the

5    parties that the maximum is 400 kilograms.  So pursuant to

6    2D1.1C8, the base offense level is 24.

7           The presentence report converted the amount of cocaine

8    and crack that were seized when Radianna Thompson's apartment

9    was searched into marijuana, pursuant to the conversion table

10   and added that into the amount of marijuana that was proven up

11   at trial and got to 325 kilograms.  That addition is correct

12   but it doesn't affect the base offense level.

13          The defense objects to the 325 kilogram estimate based

14   on a dispute regarding the amount of marijuana that Mr. Marley

15   should be responsible for.

16          The Court agrees with the government's arguments that

17   at least 325 kilograms was involved.  I actually think that's a

18   pretty conservative estimate given the estimate at trial.

19          The defendant was a leader or manager of extensive

20   criminal activity involving more than five participants.  So

21   pursuant to 3B1.1B, that's plus three.

22          The probation assessed two points for obstruction.

23   The government argues that Mr. Marley clearly lied and that the

24   Court should make a perjury finding regarding his testimony

25   specifically, that he did not consent to the search of the car.

1          My sense is that Mr. Marley lied repeatedly during the

2     suppression hearing.  And I question the truthfulness of a

3     variety of statements that he made during his interview with

4     the probation department.  All of that might justify an

5     obstruction adjustment.  It is not going to affect the sentence

6     I am going to impose, so I'm not going to assess obstruction

7     points.  That brings the total adjusted offense level to 27.

8          Mr. Marley has an extensive criminal history.  In 2003

9     he was convicted for criminal possession of marijuana in the

10    first degree.  That conviction involved 19 pounds of marijuana.

11    He gets no criminal history points for that conviction.

12         In 2005 he was convicted of conspiracy to distribute

13    an possess with intent to distribute marijuana and possession

14    of an unlawfully produced United States document.  I would note

15    that he was caught in a car with 70 pounds of marijuana.

16    That's three criminal history points.

17         2009 he was convicted of misdemeanor possession of

18    marijuana.  That's one criminal history point.

19         2010 he was convicted of possession of a weapon in the

20    third degree.  That's three criminal history points.

21         2013 he was convicted of accessory after the fact.

22    Three criminal history points.

23         2015 he was convicted of criminal possession of

24    marijuana in the fourth degree.  He was arrested with two

25    pounds of marijuana.  That's one criminal history point.

1          This offense was committed while he was on conditional

2     discharge from the 2015 conviction.  That's two criminal

3     history points.  That brings the total to thirteen.

4          Thirteen criminal history points puts him in criminal

5     history category six, level 27.  Criminal history category six

6     yields a guidelines range of 130 to 162 months for Count One.

7          I would note as Mr. Konoski argued during his

8     sentencing submission that two of Mr. Marley's criminal history

9     points are for misdemeanor convictions.  If I were to ignore

10    those two criminal history points that would bring Mr. Marley

11    to criminal history category five and a guideline range of 120

12    to 150 months.  Again, this is all for Count One.  The

13    guideline for Count Two is the mandatory minimum of 60 months.

14         Are there any guideline arguments that I have

15    addressed, Mr. Longyear?

16         MR. LONGYEAR:  No, your Honor.

17         THE COURT:  Mr. Konoski?

18         MR. KONOSKI:  No.

19         THE COURT:  I don't see a basis under the guidelines

20    for a departure.  Are there any factual issues in dispute other

21    than the quantity of drugs?

22         Mr. Konoski, I've considered your argument.  I do not

23    agree with the argument on quantity is well taken.

24         MR. KONOSKI:  No additional factual disputes.

25         THE COURT:  OK.  All right.  Would the government like

1    to be heard on sentence?

2              MR. LONGYEAR:  Thank you, your Honor.

3              We would primarily rely on our submission.  Obviously,

4    this was a trial.  So the Court is very familiar with the

5    facts.  Here, the government submits that a guidelines sentence

6    on Count One to be followed by the five year mandatory minimum

7    on Count Two is appropriate in this case.

8              Mr. Marley in the government's view was a major

9    trafficker of marijuana.  And he engaged in his business as the

10   Court heard through the testimony of Ms. Radianna Thompson and

11   Ms. Elaine Heron and Mr. Griffith.  He used people that were

12   close to him, in particular Ms. Thompson, storing the drugs and

13   the gun in a blue barrel that was in a bedroom where his

14   children slept.  And it seems without much regard for his

15   children's safety, without much regard for Ms. Thompson,

16   Ms. Heron, he used them and their apartments as stash houses to

17   run his business.

18             We heard through the testimony of Mr. Griffith that

19   although he was a somewhat willing participant in this scheme,

20   Mr. Griffith felt threatened early on that if he did not

21   continue to receive the packages from Marley that harm, that

22   Mr. Marley or those who worked with him may harm Mr. Griffith

23   for Mr. Griffith's family members.

24             In addition to the marijuana, as we heard throughout

25   the trial in call after call after call, there were references

1       to crack cocaine, heroin and cocaine.  So Mr. Marley was a

2       diversified drug dealer.

3                THE COURT:  Although he was primarily a marijuana

4       dealer; is that fair?  Even with all the wiretaps that you've

5       listened to, cocaine, heroin and crack were sidelines at best.

6                MR. LONGYEAR:  His primary business was marijuana but

7       to the extent he got his hands on other products he was ready

8       willing and able to sell those products.

9                THE COURT:  He wasn't drawing the line with marijuana.

10               MR. LONGYEAR:  Correct.

11               Secondly and significantly in this case was the

12      possession of firearms.  As we saw in testimony at trial in

13      that blue shipping barrel in his children's bedroom, not only

14      was there the one firearm that had his DNA on it but there were

15      multiple caliber bullets.  It wasn't just the .40 caliber.

16      There was .357, .9 millimeter, et cetera.

17               It is the contention that Mr. Marley carried firearms

18      to further his drug business for protection and intimidation.

19      So it's the government's view that this is a serious crime and

20      that a sentence within the guidelines is appropriate in this

21      case given Mr. Marley's conduct here and in view of his

22      criminal history which is quite substantial.

23               THE COURT:  Let me ask you something.  You're not

24      looking for forfeiture in this case and I know that the primary

25      target of the wiretap was in money laundering.  Do you have a

1    sense of where Mr. Marley's money is.  We just heard he paid

2    $63,000 for his first attorney, but other than that, does the

3    government know where any of the money went?

4             MR. LONGYEAR:  We don't, your Honor.

5             THE COURT:  OK.  All right.  Mr. Konoski.

6             MR. KONOSKI:  Yes, judge.  My sentencing memo is

7    approximately 43 pages.  I've addressed everything in the memo

8    that I wanted to address.  However, I did argue that the

9    obstruction points shouldn't be added.  Your Honor, had

10   concluded that they are not going to be added.  But I also

11   argued that the criminal history category somewhat because of

12   two additional charges that are in there somewhat overstates

13   the severity of Mr. Marley's past conduct.  If you were to

14   remove that or include that as part of your decision on a

15   variance which we're asking the Court for, that would bring

16   down the guidelines range to about 120 to 150 months.

17            THE COURT:  Correct.

18            MR. KONOSKI:  We're asking the Court to vary even

19   further from that because of the mandatory minimums.

20            THE COURT:  Mr. Marley's got the B1B plus the gun

21   conviction which has to run consecutive.  Obviously, when you

22   add those together you have a ten year, effectively a ten-year

23   mandatory membership which is an enormous amount of time

24   standing alone.  If the Court were to just go off of the

25   guideline range of the 120 to 150 months and even gave the

1   minimum on that you would have ten years just on Count One

2   which effectively is a (b)(1)(a) time period that would

3   effectively be a time attributable to the mandatory minimum on

4   (b)(1)(a).  So we're asking the Court to vary even further so

5   that Mr. Marley doesn't wind up with effectively a 15-year or

6   longer sentence because if you have the 120 on Count One as a

7   minimum, if the Court gave the minimum, plus five year

8   consecutive on the gun you have effectively a 15-year sentence

9   which is just a phenomenal sentence in a case where I don't

10  mean to undermine the conduct here.  I am not trying to do

11  that.  Obviously, it's serious.  So when I say it's only a

12  marijuana case, for the most part I don't mean to undermine the

13  nature of the charges.  I understand the severity.  But the

14  drugs, the heroin or the cocaine and crack cocaine was just a

15  sideline thing.

16          It appeared from even the evidence at trial -- my take

17  on it anyway -- was that if it was there, it was there and it

18  wasn't there much.  It was mostly marijuana.  And in a

19  situation where many states are leaning towards making

20  marijuana legal, it just seems to be an extraordinary harsh

21  establishes to wind up with a ten plus year sentence on a

22  marijuana case.  And again, I'm really not trying to undermine

23  the level of conduct here.

24          THE COURT:  I understand what you are saying.

25          MR. KONOSKI:  But we're asking for the minimums which

1    ten years standing alone is just an enormous amount of time and

2    that's what we're asking the Court to do.

3           Thank you.

4           THE COURT:  All right.  Thank you.

5           Mr. Marley, would you like to be heard?

6           THE DEFENDANT:  Yes, your Honor.

7           Over the period of time you have heard testimonies

8    from people who has been around me for a very long time.

9           THE COURT:  Hang on a second.

10          Could you move his screen.

11          (Pause)

12          THE DEFENDANT:  You have heard of a period of time due

13   the course of trial that Mr. Marley does this, Mr. Marley does

14   that but you have never heard how much of a nice person I am

15   because I am a dad.  I am a father.  I am an uncle and I am a

16   loving person as well.

17          During the course I've known the ladies have testified

18   against me which one is my baby mom that I have been around for

19   17 years.  The next one is like a mom that I've been around for

20   like 20 years.  I ain't got no animosity towards them because I

21   know they was threatened by the government and they had to do

22   what they had to do.  But when the time comes everybody throw

23   me under the bus as if I'm this bad person.

24          Ms. Thompson testified that I always have a gun.  She

25   knows within her heart that I never have a gun and I never

1   possess is gun.  Ms. Thompson and I've never been apart.  She

2   might feel -- it when she wants clothes or bag she might do

3   something to get some money.  That's the part she will play

4   sometimes.  But Ms. Thompson go to work from seven in the

5   morning until five.  So she have never been involved but I know

6   I've done wrong which I've come to accept that marijuana in the

7   neighborhood.  But she have never played a part like being

8   involved in the business.  She goes to work from seven.  She

9   comes home at five.

10          Ms. Heron, the same thing.  There is a lot of people

11   around Ms. Heron and I'm always out of town.  Even when I got

12   locked up and they got the search warrant for these people, I

13   was three months away, your Honor.  I have never been in New

14   York from I locked up in June I have been in Cleveland and

15   California.  So I know they did what they had to do to help

16   they self.

17          THE COURT:  Are you saying it wasn't your marijuana

18   and it wasn't your gun in the barrel?

19          THE DEFENDANT:  Your Honor, I am saying like the gun

20   in the barrel like, I've already got convicted of it and I

21   never take responsibility for something that wasn't mine.  And

22   I testified.  I told my attorney that the gun in the barrel

23   wasn't mine.  You see they find three DNA on the gun and it

24   could have been my clothes or anything.  That's my baby mom.

25   She got multiple people living in the house, like seven/eight

1    people and that's my baby mom.  She got her family living there

2    I could argue.  The first thing you see Ms. Heron told you that

3    whenever I raise a issue they will kick me out the house and

4    tell me to go.  Then they friend me up back and tell me to come

5    back.  So I take the responsibility.  My kids live there.  I

6    never want to see her go to prison.  I still ain't got no

7    animosity toward her.  I stand up as a man.

8            I totally apologize to you that whatever I did in the

9    community that is wrong, a little marijuana, going legal now, a

10   little bit undermining -- but whatever I did.  But I want to

11   bring to your attention, your Honor, within this proceeding the

12   amount of time that I've spent there and I've get to understand

13   a few things about the case, that at the suppression hearing

14   that I've testified truthfully to you, your Honor, and I've

15   testified to the best of my ability.  And you know I might

16   raise a few issues with you.

17           You know I'm also involved in this case and I've did

18   my investigation on my own.  During the course of trial when

19   all of that and my attorney before trial that I want him to

20   bring forth evidence that could you exonerated me if the proper

21   investigation was done on my behalf.

22           So, your Honor, my previous attorney, not Mr. Konoski,

23   have left me to -- you've seen the crowd is only two people is

24   here to support me, my aunt and a very good friend of mines

25   because the financial crisis he has left me in.  I've convinced

1    my older family to put up money because they believe I've never

2    spoken to a undercover.  I believe I wasn't smoking marijuana.

3    I never gave consent.  I've convinced them to put up $63,000 of

4    hardworking funds because of all of that money, your Honor.

5    They haven't submitted no letters on my behalf.  Everybody left

6    me in the jail by myself but I take responsibility.  But I want

7    to let you know, your Honor, that Mr. Konoski has convinced me

8    to retain him and he has misrepresentation to you on numerous

9    occasions he has made misrepresentation to me.  He has deluded

10   me and my family by submitting false information to us.  And

11   when I ask him he would send me e-mail using the courts and

12   using you as a tactic for me to not write letters and submit

13   which I got documents and a forthcoming memorandum to you.

14          Your Honor, I've done my own investigation into this

15   case.  While the number that was presented to you on February

16   the 4th 347981 number 7101 number that was presented to you,

17   that was a number from my phone records.  I've done my own

18   investigation.  The numbers that the undercover officer had on

19   February 4 that he was making all the undercover calls from it

20   was a 917-777-448 number, your Honor.  And not only that he had

21   a recording on February the 4th that he used to record

22   Mr. Stern and that content of the call that they submitted to

23   this Court and using this Court that I'm including on behalf of

24   Julian, that same content was used on February the 4th which it

25   comes I want you to take into consideration that it comes as a

part of what I've always told by and believe that the GPS

application that they submitted on February 4 was the original

documents and that Mr -- made it clear that he never received

or he never witnessed a call.  He made clear in his application

that I was a John Doe.  My identity was unknown and because I

was working with an undercover agent which I had no record of,

I've never worked with an undercover.  I've never belonged to a

part of Mr. Stern organization.  So I want you to take that

into reconsideration, your Honor.

          Wiretaps have been substantial against me but certain

things that are used was wrong, your Honor.  Certain things

that was presented to you was false.  And one more thing I want

to bring to your attention that during the course of the

wiretap that the prosecutors had told you that during

Mr. Stern's wiretap I was making Mr.  -- was making, conducting

money drops on my behalf.  I have listened completely to the

old Stern wiretap, your Honor.  Mr. Paul conducted money drops

on me that they told you about.  Mr. Paul was conducting money

drops for me with Mr. Stern on behalf of me.  I've listened to

all the calls, your Honor, and the numbers that the -- had with

a 717-758-8299 which is Luna and there is a next number

949-235-4126, your Honor.  These information wasn't given to

you.  I had to work hard to obtain them on my own, your Honor.

I just want to know that these was documents that there was

never disclosed to me.  So, I want to preserve that for the

1    record.

2          But I do apologize for anybody, to all my family who

3    love me, who had loved me before and what ain't love me no more

4    that I always got mad love for them no matter what.

5          THE COURT:  I'm not sure what your point is,

6    Mr. Marley.  Are you arguing that the government failed to

7    disclose information?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  What did they not disclose?

10         THE DEFENDANT:  That a phone call was recorded on

11   February the 4th the number that they submitted to the Court,

12   the 3447 number was a number from my phone records, your Honor,

13   not a number from that Luna use.  The number Luna possess on

14   February the 4th was a (917)717-4487.  That's what he had

15   making all the undercover calls, your Honor.

16         THE COURT:  Mr. Longyear.

17         MR. LONGYEAR:  Your Honor, I don't think I can

18   address --

19         THE COURT:  I don't remember that evidence from the

20   suppression hearing.  I remember that Luna testified that he

21   made the phone calls.

22         THE DEFENDANT:  Your Honor, the thing I have been

23   raising over the months from my previous attorney, Mr. Cohen,

24   that the application on February the 4th that they submitted to

25   the Court was that I am a John Doe with my identity unknown.

1           THE COURT:  They did not know your identity at that

2      time.

3           THE DEFENDANT:  So what I've told him I came to

4      understand was after I was arrested on February the 8th there

5      is an ungraded version of events that now I become someone with

6      a Caribbean accent which is in the DEA six that was two days

7      before.

8           THE COURT:  I'm sorry.  Say that again.

9           THE DEFENDANT:  That was a upgraded version that was

10     upgraded by the case agent, James Enders, that Mr.  Marley had

11     a Caribbean accent and that he identified me as someone with a

12     Caribbean accent.  But previously before the one that was

13     submitted by the ADA prosecutor, it was that I am a "John Doe".

14          THE COURT:  Right.  They did not know your name at

15     that point.

16          THE DEFENDANT:  Yes.  And what they told the Court is

17     that I was working with an undercover and that Luna said that

18     not in itself but a member of his team made a phone call to me

19     and it was arranged to me meet with me within the past week.

20          THE COURT:  I think I had dealt with that issue.  It

21     was not well drafted but none of this has anything to do with

22     the evidence that was presented against you at trial.

23          THE DEFENDANT:  I know.  But what I'm saying, your

24     Honor, is if you had known of these information that was

25     withheld I think the evidence would have been insufficient to

1   find without a reasonable doubt, your Honor.

2                THE COURT:  All right.  Thank you.

3                Just based to what you've said here today, none of

4   that has anything to do with the quantum of evidence that was

5   presented against you which was an overwhelming --

6                MR. KONOSKI:  Yes, your Honor.

7                THE COURT:  Including people who love you and are

8   close to you testifying that you were a marijuana dealer from

9   their apartment.

10               THE DEFENDANT:  Well --

11               THE COURT:  Which would have been enough standing

12   alone to convict you.

13               THE DEFENDANT:  Well, fine.  Well, like you said they

14   testified.  You've got to take into consideration that please

15   people had a lot of people living with them.  And most of the

16   things that I, from my personal and my honest opinion of, your

17   Honor, they just threw me under the bus.  I am just here.  You

18   know what I'm saying?  Now everybody is trying to be free and

19   prosecutorial agreement.  Nobody wants to take the

20   responsibility, your Honor.

21               THE COURT:  OK.  Mr. Marley, what I hear you telling

22   me is that you are an innocent man.

23               THE DEFENDANT:  No, I didn't say that.  No, your

24   Honor.

25               THE COURT:  So they threw you under the bus but they

1   didn't just make up --

2              THE DEFENDANT:  No.  Some of the things that they

3   testified to is simply not true.

4              THE COURT:  OK.  All right.  Mr. Marley, under federal

5   law I am required to consider the nature and circumstances of

6   the offense and the history and characteristics of the

7   defendant.  In terms of you I have considered your history and

8   characteristics to the extent I can.

9              I start with the fact that I really don't know what

10  your background is.  Your explanation to the probation officer

11  in the Southern District of New York was different in some

12  material ways in which you told the probation officer when you

13  were interviewed at the Western District of Pennsylvania.  What

14  we do know beyond a reasonable doubt is that you took your drug

15  business into the home where you were living with two

16  relatively young children.  Ms. Heron was like a mother to him.

17  The other woman was the mother of his children.

18             While they both should have said "no" and sent you out

19  onto the street, they allowed you to deal drugs from their

20  apartment.  By doing that, Mr. Marley, while you may be annoyed

21  that they "threw you under the bus", you put them all at risk

22  of being prosecuted.  Ms. Heron could have gone to jail.  The

23  mother of your children could have gone to jail.  Where would

24  that have left your children?  They would have been in foster

25  care.  I don't think you care about that but that's what would

have happened.  So you put those children at risk.  You put

them at risk because you were dealing drugs from their

apartment and you put them at physical risk because there was a

weapon in the barrel.

        Children get into things.  Do you know the number of

children who are killed accidently by guns is astronomically

outrageous in this country.  All it takes is finding the gun

and playing with it.  And one or the other of them could have

been killed.  You risked that.  And you seem oblivious to the

fact that you put your children at grievous risk of harm.

        You have multiple convictions and you appear to have

been a marijuana dealer for years.  You may be a compulsive

gambler.  You may have a drinking problem.  And you may have a

marijuana problem or you may have none of those problems

because sometimes you say you do have a problem and other times

you say you don't.  So I have no idea.

        You may a U.S. citizen because you were born in the

Virgin Island.  I'm not sure which.  Hopefully, immigration

will figure that out and if you're Jamaican you'll be deported

at the end of your sentence.

        You have skills as a barber.  But other than a very

few months while you were on parole, you seem never to have

held a legitimate job in this country.

        The wiretap conversation and the testimony with Mr.

Griffith makes it clear, as well as you testimony that you can

1   be both charming and threatening.  I believe that the threats

2   that you made against Mr. Griffith and the threats that could

3   be heard on the wiretap were true.  I think you would do harm

4   to people if they crossed you.  My overall conclusion about

5   you, Mr. Marley, is that you have been a marijuana dealer all

6   or most of your adult life.  Prior terms of incarceration have

7   had little or no impact on your desire to stay on the right

8   side of the law.

9            Taking into account that evaluation of the defendant,

10  federal law requires me to impose a sentence that is reasonable

11  and no greater than necessary to accomplishes the goals of

12  sentencing.  I've considered all of the required factors.

13           In terms of the seriousness of the offense, if this

14  were just marijuana dealing I would say the Court might

15  consider this to be not among the most serious of all felony

16  offenses but you are not a nonviolent drug dealer.  You a drug

17  dealer who uses violence to maintain your customers and to keep

18  the people working with you in line.  You also dealt cocaine

19  and heroin though clearly not as much.  But most serious, you

20  stored weapons and drugs in your children's bedroom.

21           I've considered the need to deter criminal conduct.  I

22  don't have a lot of hope for Mr. Marley that he is ever going

23  to change his ways.  I'm very concerned with his propensity for

24  violence.  I note that he has a conviction for attempted

25  possession of a weapon and there were multiple guns seized that

23

1   could be connected to Mr. Marley.

2           Your sentencing commission Mr. Konoski argued on your

3   behalf that you used the gun only for your defense but it's

4   really not much of a defense considering the fact that you were

5   defending was an unlawful business.

6           Terms of general deterrence, I don't think my sentence

7   in this case is going to have any general deterrent affect.

8           I've considered the need to protect the public from

9   the defendant.  Again, what concerns me about you, Mr. Marley,

10  is that violence is associated with your drug dealing and so

11  this is not an insignificant factor.

12          I've considered the need to provide the defendant with

13  needed education and vocational or medical treatment.  In

14  particular, Mr. Marley, you need to develop a skill so that you

15  can operate legally.  Again, you've got barbering skills.

16  Maybe you can brush those up and decide to go straight when you

17  get out and be a barber.  You can have a perfectly good life as

18  a barber.

19          Mr. Konoski, I agree with your argument that the two

20  misdemeanor convictions unfairly inflate Mr. Marley's true

21  criminal history.  Removing those two puts the guideline at 120

22  to 150 months.  I understand your point that that seems a

23  little long considering the fact that that would be the

24  equivalent of a (b)(1)(a) conviction, that five years would

25  then sit on top of that.  So I'm going to vary downward

1  somewhat.

2        The reason I am not varying downward more is I truly

3  have real concerns about what Mr. Marley is going to do when he

4  gets out of jail.  I don't think he is going to change his

5  ways.  So the issue you is really incapacitating him for a

6  reasonable length of time maybe until he gets to the point from

7  just a pure age perspective that he decides he doesn't want to

8  risk going back to jail.

9        So taking all of this into account, I'm sentencing

10  Mr. Marley to the custody of the Attorney General for a period

11  of 96 months on Count One and 60 months consecutive on Count

12  Two with five years of supervised release to follow.

13        There are mandatory conditions of supervised release,

14  Mr. Marley.

15        You must not commit another crime.

16        You may not illegally possess a controlled substance.

17  Marijuana is a controlled substance.  If it gets legalized

18  between now and when you get out, fine.  But if doesn't, it's a

19  controlled substance.  You can't possess it.

20        You cannot possess a firearm or other destructive

21  device.

22        You must cooperate in the collection of DNA.

23        Mandatory drug testing will be waived and drug

24  treatment will be ordered.  I am assuming have you a drug

25  problem.  Although, I am not entirely sure.  I'm also assuming

I7UAAMARS                              Sentence

1   you are going to stay in the United States, but I'm not sure

2   about that either.

3             In addition to the standard conditions of supervision,

4   I am ordering the following special conditions:

5             The defendant must submit his person, residence, place

6   of business, vehicle or other premises under his control to

7   search if the probation officer has a reasonable belief that

8   contraband or evidence of a violation of the terms of the

9   conditions of supervised release may be found there.  Any

10  search must be conducted at a reasonable time and in a

11  reasonable manner.  Failure to submit to the search may be

12  grounds for revocation.  The defendant must inform any other

13  resident that the premises may be subject to search pursuant to

14  this condition.

15            The defendant must participate in an outpatient drug

16  and alcohol treatment program approved by the probation office

17  which may include drug testing to determine whether the

18  defendant has reverted to the use of drugs or alcohol.

19            The defendant must contribute to the cost of services

20  provided based on his ability to pay or the availability of

21  third party payments.  The Court authorizes the release of

22  available drug treatment evaluations and reports including the

23  presentence report to the substance abuse treatment provider.

24            The defendant must participate in a gambling treatment

25  program approved by the probation office.

1          The defendant must contribute to the cost of services

2    provided based on his ability to pay or availability of third

3    party payments.

4          The defendant must report to the nearest probation

5    office within 72 hours of release.

6          The defendant must cooperate with the immigration

7    authorities and comply with their directives.

8          The defendant will be supervised by the district of

9    residence.

10         Are you seeking forfeiture in this case?

11         MR. LONGYEAR:  No, your Honor.

12         THE COURT:  All right.  I'm not imposing a fine

13   because I find there is no ability to pay or at least the

14   government has not located where any of Mr. Marley's money is.

15   I must impose a special assessment of $200.

16         Are there any underlying counts or charging

17   instruments?

18         MR. LONGYEAR:  Your Honor, there is the underlying

19   indictments.  So at this time the government would move to

20   dismiss all counts in underlying indictment.

21         THE COURT:  All the underlying indictments are

22   dismissed.

23         Mr. Konoski, does the defendant have any requests

24   regarding designation?

25         MR. KONOSKI:  Yes.  He asks specifically for a prison

I7UAAMARS                              Sentence

1    located in Danbury over in the Connecticut region.

2              Is that correct?  Anywhere in New York.

3              THE COURT:  All right.  Mr. Marley, I will request

4    that you be designated in the New York area.  All I can do is

5    ask.  It's up to the Bureau of Prisons where you will be

6    designated.

7              Mr. Marley, you have the right to appeal.  If you are

8    unable to pay the cost of an appeal, you may might apply for

9    leave to appeal in the forma pauperis.  The notice of appeal

10   must be filed within 14 days of the judgment of conviction.

11             Anything further from the government?

12             MR. LONGYEAR:  No, your Honor.

13             THE COURT:  From defense?

14             MR. KONOSKI:  No, judge.

15             Thank you very much.

16             (Adjourned)

17

18

19

20

21

22

23

24

25